FILED

DAWN DEVORE, STEFFINI SELLERS, GEORGE ANTHONY BAN III,
Plaintiffs, Pro Se
15171 Victoria Lane, Huntington Beach, CA 95624
707-635-3644

2020 MAR 19  PM 3: 48

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAWN DEVORE, STEFFINI SELLERS, GEORGE ANTHONY BAN III, Plaintiffs, Pro Se | Case Number: SACV20 - 0 0 5 6 3 -ODW (RAO) |
| vs. | COMPLAINT FOR DAMAGES AND REQUEST FOR INJUNCTIVE RELIEF |
| 1. UNITED STATES DEPARTMENT OF DEFENSE | |
| 2. UNITED STATES DEPARTMENT OF HOMELAND SECURITY | 42 U.S.C. § 1983 CONSPIRACY AGAINST RIGHTS |
| 3. NATIONAL AERONAUTICS AND SPACE ADMINISTRATION | VIOLATIONS OF THE 4th AND 8TH AMENDMENTS OF THE UNITED STATES CONSTITUTION |
| 4. THE BOEING CORPORATION | |
| 5. JOSEPH NOONAN, SCREENED IMAGES, "CORRECTIONS.COM" | TRESPASS |
| 6. TIM BLAKE, SCREENED IMAGES, "CORRECTIONS.COM" | TORTURE |
| 7. INSITU | |
| 8. L3 HARRIS | |
| 9. NORTHROP GRUMMAN | |
| 10. UNKNOWN DOES 1-20 | |
| Defendants. | PAID |

DEVORE, SELLERS, BAN III VS. UNITED STATES DEPARTMENT OF DEFENSE, ET. AL.
COMPLAINT FOR DAMAGES AND REQUEST FOR INJUNCTIVE RELIEF

PAGE 1

## I.    PROCEDURAL

Defendants were properly notified of this action.  PLAINTIFFS seek only injunctive relief related to the Department of Homeland Security ("DHS"), at this time.  This Complaint, therefore, also serves as Notice to the DHS.  The Army responded for the Department of Defense, and for all branches, on September 19, 2019, pursuant to AR 27-20.  This Complaint, therefore, is timely filed.

## II.    COMPLAINT

(1.)

PLAINTIFFS are DAWN DEVORE, a 62-year old woman, together with her two (2) adult children, STEFFINI SELLERS (age 37) and GEORGE ANTHONY BAN, III (age 33). This matter also concerns their (3) children/grandchildren; SUMMER LYNN SELLERS (age 10), JACE RYAN SELLERS (age 5), and GEORGE ANTHONY BAN, IV (age 9), related to human trafficking, however, PLAINTIFFS are pro se and non-attorney parents cannot represent their minor children.  PLAINTIFFS want to go on record related to the minor children as issues related to them arise from the same set of operative facts, and PLAINTIFFS are actively seeking counsel for the children.

All PLAINTIFFS are requesting injunctive relief, preliminary and permanent restraining orders.  PLAINTIFF DAWN DEVORE requests monetary damages for Trespass and Torture.

(2.)

PLAINTIFFS learned that the Obama Administration implemented a global, nonconsensual, remote medical research program, together with Russia, China, and more, using NASA, "implantable nanosensors" (currently under research and authorized by the

DEVORE, SELLERS, BAN III VS. UNITED STATES DEPARTMENT OF DEFENSE, ET. AL.
COMPLAINT FOR DAMAGES AND REQUEST FOR INJUNCTIVE RELIEF

Congressionally Directed Medical Research Program ("CDMRP" )), and medical telemetry[1] via the COSPAS-SARSAT Search and Rescue Satellite system, which includes the Chinese "BEIDOU" and Russian "GLONASS" satellites, and also the Russian Satellite System, GlobalStar, for the transmission of data.  [Attached Exhibit 1 is a true and correct copy of the document showing the CDMRP authorized research into the "Implantable Nanosensors."].

(3)

**Obama sacrificed hundreds, if not thousands of United States Citizens, including children and infants, to this medical research program.**  With the help of several experts, PLAINTIFFS came to realize they were being used for this research, including their children, and had been labeled as "assets" in investment portfolios that appear to have been "traded" (reverse rendition) for use by other countries, including Russia and China.  Below is an excerpt from the "CUSIP" that was provided for PLAINTIFF'S DAUGHTER, 10-year old SUMMER SELLERS, known to the Obama Administration simply as "#72200Q414."  She has a brain stem implant, and other devices implanted in her, for Obama's Brain Initiative.  The acronym "CUSIP" stands for "Committee on Uniform Securities Identification Procedures."



**SUMMER SELLERS (ACCT 2249 [224.9] CA)**
**PIMCO StocksPLUS International Fund U.S. Dollar Hedged**
Symbol:                PIPCX
CUSIP                  72200Q414

Inception Date:        10 30 2003
Net Assets:            $3,152,145,000.00 as of
                       7 30 2019
Portfolio Assets:      $3,152,145,000.00 as of
                       7 30 2019

PIMCO StocksPLUS International Fund U.S. Dollar Hedged seeks to exceed the total return of the Morgan Stanley Capital International Europe Australia Far East "EAFE" Index by investing in non-U.S. equity derivatives, backed by a portfolio of fixed income instruments.

---

[1] The term "medical telemetry" refers to the automatic transmission of medical data, at a distance, by radio, cellular or other means.

DEVORE, SELLERS, BAN III VS. UNITED STATES DEPARTMENT OF DEFENSE, ET. AL.
COMPLAINT FOR DAMAGES AND REQUEST FOR INJUNCTIVE RELIEF

(4.)

Obama authorized the nonconsensual implantation of these "nanosensors" into any United States Citizen via amendments to the 21st Century Cures Act, Section 3024, which states: "The clinical testing of medical devices and drugs no longer requires the informed consent of the subjects if the testing poses no more than minimal risk to the subjects and includes safeguards." [See Attached Exhibit 2, 21st Century Cures Act, Section 3024.]   The term "Device" is defined in Section 201(h) of the FD&C Act (21 U.S.C. 321) as "an instrument, apparatus, implement….or implant. [See Attached Exhibit 3, Definition of Device, 21 U.S.C. 321].   The term "Investigational Medical Device" is defined by the FDA as "exempt from the premarket notification procedures."  According to FDA literature "when clinical evidence is necessary to support marketing authorization of a medical device, an investigational device exemption (IDE) may be necessary.   An IDE allows the "investigational device" to be used in a clinical study in the United States in order to collect safety and effectiveness data." [See Attached Exhibit 4, Definition of "Investigational Medical Device, FDA]

(5.)

PLAINTIFFS had these devices installed in their bodies, during routine surgeries, without their knowledge or consent. PLAINTIFF DEVORE flew to Atlanta, Georgia and had three (3) of them surgically removed and analyzed and positively identified as the "Implantable Nanosensors".  [See Attached Exhibit 5, Post Op Surgical Note, by Dr. Susan Kolb, and Exhibit 6, Analysis of Implantable Nanosensors.]  One of them was identified two (2) years later as a "Particle Accelerator on a Chip" made by Stanford University, for use in radiation research. [See Attached Exhibit 6a, Microphotograph]

(6.)

Because the nanosensors contain electronic circuits, they can be detected by professional electrical engineers using a "non-linear p-n junction detector[2]." PLAINTIFFS hired professional electrical engineer, John Kingston, with AAA Security, Salt Lake City, to conduct scans of their bodies using the non-linear p-n junction detector.  John Kingston is a professional electrical engineer and technical surveillance countermeasures expert.  Staff of AAA Security are trained and certified in the use of this highly specialized equipment which is also used by the Department of Homeland Security, the Federal Bureau of Investigations and the Central Intelligence Agency to detect covert electronic devices.

(7.)

The PLAINTIFFS were scanned in October 2017.  Results for PLAINTIFF GEORGE BAN III indicated that 13 semiconductors had been implanted in him.  Semiconductor is the name used by electrical engineers for the nanosensors.  An excerpt from the report is below:

depths and levels. After multiple passes our equipment indicated the following. Right hand semiconductor, right shoulder semiconductor, center of chest semiconductor, center of abdominal area semiconductor, right waist area semiconductor, left inner front thigh semiconductor/corrosive, right leg below the knee semiconductor/corrosive, center of back corrosive, left waist semiconductor, left back side of knee semiconductor, right back inside thigh semiconductor, right side neck just below the ear corrosive, center of top of head corrosive.

Results for PLAINTIFF STEFFINI SELLERS indicated that 13 Semiconductors were also implanted in her.  An excerpt from the report is below.

---

[2] The Non-linear p-n Junction Detector is a device that illuminates the body with high frequency RF energy as the wand passes over the body.  Any 'non-linear' junction in the vicinity, particularly the p-n junction will receive the energy and because of the asymmetric response of the junction to the electric field, it will rectify it, and re-emit some of it on multiples of the illuminated frequency.

DEVORE, SELLERS, BAN III VS. UNITED STATES DEPARTMENT OF DEFENSE, ET. AL.
COMPLAINT FOR DAMAGES AND REQUEST FOR INJUNCTIVE RELIEF

depths and levels. After multiple passes our equipment indicated the following. Right side of neck just below jaw semiconductor. Left Back skull just behind left ear corrosive. Center of chest semiconductor/corrosive (this is a strange reading), left mid abdominal area semiconductor, front pelvis left and right side semiconductor, right leg inner thigh semiconductor, center of back just above appendix area semiconductor, left and right buttock semiconductor, left and righ ankle semiconductor.

PLAINTIFF DAWN DEVORE was scanned 4 different times in 4 different locations in September and October 2017. Results for PLAINTIFF DAWN DEVORE indicated 17 semiconductors had been implanted in her shoulder, neck, chest, breast, ankle, knee, thigh, calf, center back, lower back, buttocks, right ear, forehead, left side neck, shoulder blade, left and right thighs. This was after 3 had been removed, for a total of 20. [Attached as Exhibits 7, 8 and 9 are copies of the reports for PLAINTIFFS BAN AND SELLERS, and Affidavit of John Kingston related to the findings for PLAINTIFF DAWN DEVORE.]

PLAINTIFF STEFFINI SELLERS was implanted during a plastic surgery. The military surgeon who invaded her room to implant her was named on the post op report as "Dr. Kevin Miller." He is a foot doctor. He goes by his military title of "First Assistant" when performing surgeries for the military and goes by "Doctor" when working as a civilian. [See Attached Exhibit 10, Post Op Report and Bio for Dr. Kevin Miller.]

Even though the minor children cannot be represented in this action as long as PLAINTIFFS are without counsel, it is important to note that 10-year old SUMMER SELLERS and 5-year old JACE RYAN SELLERS were also implanted and tested positive for the devices, and 8-year old GEORGE ANTHONY BAN IV shows symptoms and is being tested as soon as the family can arrange it. Something even more nefarious happened to him which is explained on the next page.

PLAINTIFFS are actively seeking representation for the children, which is difficult because their finances are limited and depleted in getting this far. Added to this, PLAINTIFF DEVORE hired two attorneys, both who took her money then tried to sabotage her case. Most

DEVORE, SELLERS, BAN III VS. UNITED STATES DEPARTMENT OF DEFENSE, ET. AL. COMPLAINT FOR DAMAGES AND REQUEST FOR INJUNCTIVE RELIEF

notably, an attorney named "T. Matthew Phillips" who turned out to be a particle physicist and was working for the opposition.  A complaint is being filed with the Bar Association to see if they can help return any of the funds.

(8.)

At the time of the scans, Mr. Kingston also captured the radio frequencies the devices were transmitting on which were used to identify the entities licensed by the FCC to use them, which includes the Defendants.  It should be noted that the very first signal detected for PLAINTIFF DEVORE was a signal used by the International Space Station, and orbiting satellites, at 410.802305MHz and was attempting to transmit data from DEVORE'S body at the time Mr. Kingston was conducting the scan.  This is stated in his Affidavit. (Refer to Exhibit 9, Page 5, Affidavit of John Kingston, AAA Security.)

(9.)

This all started when PLAINTIFF DEVORE worked as a monitor for the federal Court appointed Receiver, J. Clark Kelso, in the California Department of Correction's prison system, and learned that the Obama Administration was using inmates for this research and was fired for reporting it (Whistle-Blower).   [See Attached Exhibit 11, Duty Statement for Dawn Devore.)  PLAINTIFF DEVORE was required to report having signed a "Zero Tolerance Code of Silence" policy as a condition of her employment.  [See attached Exhibit 12, "Zero Tolerance Code of Silence" policy.)   Following this protected disclosure, PLAINTIFFS realized they had been placed into this program.  PLAINTIFFS spent the last 2+ years working with several experts to understand what was happening and gather enough evidence to bring this action.  PLAINTIFF'S experts include two (2) private investigators, bioenergy experts, a medical doctor, a forensic toxicologist, a surgeon, and a professional electrical engineer and technical counter-surveillance expert (signals expert).

DEVORE, SELLERS, BAN III VS. UNITED STATES DEPARTMENT OF DEFENSE, ET. AL.
COMPLAINT FOR DAMAGES AND REQUEST FOR INJUNCTIVE RELIEF

(10.)

That a program for radiation research exists is not a secret, as it was publicly announced and is being carried out under the "Congressionally Directed Medical Research Program." [See Attached Exhibit 13, "JPC-7/Radiation Health Effects Research]   The things being kept secret are the following:

(1)  how it came to be approved by deceiving Congress with a phony "feasibility study" that reversed decades of scientific research related to the effects of radioactive fallout saying it doesn't cause cancer after all;

(2) that the research includes the new "5G" which is actually a 5th generation energy/light source for renewable energy and wireless power transfer, and that Obama had invested in a company with ground-based beam forming whose name is "LightSquared" which means "Energy equals mass times the speed of light -squared." -Einstein.  The company later rebranded with the new name "Ligado" which literally means "to switch on with electricity." [See Attached Exhibit 14]

(3) that the research is a continuation of the DuPont research, including Teflon, but moved to Dow who placed their own medical doctors with test victims to contain them. PLAINTIFF DEVORE was moved under Dr. Javaid Ahktar after being put into the program who denied her medical treatment.  Investigation into Dr. Ahktar showed he went to "Dow Medical College" in Pakistan. [See Attached Exhibit 15]

(4) that the research includes exposing the research subjects to genetically engineered proteins, the FoxP1, designed to induce pluripotency in cells to transform them into embryonic like stem cells that can be used to grow new tissue and organs for transplantation medicine and as a countermeasure for radiation-induced Alzheimer's that caused Autism in PLAINTIFF GEORGE BAN'S 8-year old son, and likely many other children; [See Attached Exhibit 16]

DEVORE, SELLERS, BAN III VS. UNITED STATES DEPARTMENT OF DEFENSE, ET. AL. COMPLAINT FOR DAMAGES AND REQUEST FOR INJUNCTIVE RELIEF

(5) that the GPS Satellites are used to measure the electron and proton flux in space radiation at different elevations in order to simulate the space radiation environment for their research, and that the new "5th generation light source laser-plasma accelerator" can be tuned to the same flux of the GPS orbits to produce man-made broadband Maxwellian-type particle flux akin to conditions in space" and this is what is being used on PLAINTIFFS.  [See Attached Exhibit 17]

(6) that the "Dawn" Satellite is equipped to take measurements of neutrons and gamma radiation around asteroids in order to determine that environment so they can start mining them.  In other words, the research went far beyond small doses of radionuclides in radioactive fallout.

(11.)

Research victims are being pelted with ionizing high energy particles transmitted by the 5th generation light source, including Obama's company.  PLAINTIFF DEVORE has several videos of the beam in her home which will be presented at trial.  Other evidence of this is that PLAINTIFF DEVORE was diagnosed with acute and chronic radiation poisoning, among other things.  [See Attached Exhibit 18]  PLAINTIFF STEFFINI SELLERS was tested and found alarming amounts of radioactive Cesium and PLAINTIFF GEORGE BAN III tested positive for radioactive fallout.

(12.)

The money-making opportunities based on the new 5G technologies are vast.  These "emerging technologies" were believed to be the key drivers of future economic growth," according to the Congressional Review Committee report on Obama's "2012 Middle-Class Tax Relief and Job Creation Act."  The report also points out that the **"key technologies are not specifically addressed"** and **"appear to receive scant attention from policy makers."**  It

DEVORE, SELLERS, BAN III VS. UNITED STATES DEPARTMENT OF DEFENSE, ET. AL. COMPLAINT FOR DAMAGES AND REQUEST FOR INJUNCTIVE RELIEF

PAGE 9

was being kept secret.  [See Exhibit 19, CRC Report]

(13.)

The needed spectrum to carry out the program, most importantly "broadband" and "ultrawide band," was provided for in Obama's "10-Year Spectrum Reallocation Plan." [See Attached Exhibit 20]  Broadband was needed to simulate space radiation (which is predominantly broadband) and ultra-wideband was needed for remote imaging.  The "fifth generation light source" is broadband.

(14.)

Qualcomm, (the leading manufacturer of the 5G components) is positioning to manufacture a smaller, home energy harvesting wireless power transfer system, together with Samsung, who bought out all of Sony's LCD TV manufacturing ventures.  The new system is about the size of a small flat screen tv and can be built at existing LCD manufacturing plants because they are so similar.  This technology was invented by Duke and Washington State University.  All PLAINTIFFS had Washington State University on their FCC License Search showing this university is monitoring them.  PLAINTIFFS are being used as to test this system as well.

(15.)

PLAINTIFF DEVORE further believes that Obama added another amendment to the 21st Century Cures Act to hide the program from the President to ensure it continues which states "The procurement of medical countermeasures no longer requires Presidential approval or an agreement between the Department of Homeland Security and Health and Human Services." [See Attached Exhibit 21, 21st Century Cures Act.]

DEVORE, SELLERS, BAN III VS. UNITED STATES DEPARTMENT OF DEFENSE, ET. AL.
COMPLAINT FOR DAMAGES AND REQUEST FOR INJUNCTIVE RELIEF

(16.)

On information and belief, hundreds, if not thousands of other Americans are similarly situated and are suffering, greatly. This Complaint is filed also on their behalf.

(17.)

ALL PLAINTIFF'S Constitutional rights have been violated at the 4th Amendment related to unreasonable search and the 14th Amendment related to bodily integrity.

PLAINTIFFS DEVORE and BAN assert 8th Amendment violations, as well, for cruel and unusual punishment.

(18.)

ALL PLAINTIFFS are requesting judicial review of agency action concerning the method used to select research subjects, which includes being "Watchlisted," a highly unconstitutional process authorized by Eric Holder and recently referred to as a "sham" by certain Courts, and the human trafficking implications related to the global and financial aspects of the program. The "watchlist" includes American children and infants.

Further, inclusion on the "Watchlist" places the research victim outside the protection of the courts, and the law, thereby depriving them of their 6th and 14th Amendment rights.

Moreover, placement on the "Watchlist" appears to be the mechanism for authorizing the medical research and use of military force on the research subjects to begin with. This request is being made under separate cover to not bog down this immediate action.

(19.)

PLAINTIFFS, and the Experts that assisted them are in danger. PLAINTIFF'S Experts have been threatened and assaulted. Affidavits are provided by Dr. Hildegarde Staninger, Ph.D., [See Attached Exhibit 22]; Dr. Rima E. Laibow, MD, [See Attached Exhibit 23]; and Dr. Susan Kolb, FACS [See Attached Exhibit 24]. A communication is also provided by

Professional Electrical Engineer, John Kingston, with AAA Security. Mr. Kingston was recently assaulted and threatened that he should not testify for PLAINTIFFS. He was hit, his nose was broken, and he had residual brain swelling. Attached is a copy of the email and photo from Mr. Kingston post-assault. [See Attached Exhibit 25]

(20.)

PLAINTIFF DEVORE received death threats against her and against her son, PLAINTIFF GEORGE ANTHONY BAN III who has been beaten, had his leg and shoulder broken by law enforcement "dog piling" on him, and imprisoned immediately thereafter for 5 days with no charges, no medical attention and no visitors allowed. He was also the subject of a vehicular assault that threw him and his vehicle into a ditch, totaling his car and damaging his shoulder. PLAINTIFFS hired 3 lawyers, related to the above incidents named Gingery, Rothchild and Miller. All were instructed to abandon the case. These are examples of being outside the protection of the courts and law enforcement. Attached Exhibit 26 is a photo of what his leg and foot looked like by the time he was finally released from Police custody. We were not able to get justice for him and the harassment by law enforcement continues. George was recently set up, and the Newport Beach Police Department ("NBPD") falsified a report made by a witness and attempted to coerce PLAINTIFF VALERIE SMITHERS (George's girlfriend) into saying that George had physically harmed her. The NBPD charged him with domestic violence when none had occurred.

(21.)

ALL PLAINTIFFS have been injured, physically and emotionally, to varying degrees, as set forth herein, and are seeking immediate preliminary and permanent injunctive orders to enjoin Defendants from this continued conduct.

Further, PLAINTIFF DAWN DEVORE is seeking monetary damages for Trespass and Torture.

(22.)

It should also be noted that PLAINTIFF DEVORE was/is being used for the testing of "Cyborg Tissue" created by Charles Lieber, a Professor at Harvard, who was recently arrested, along with two other Chinese nationals, for his ties to Wuhan University, in China,. Shortly after the arrests, the Corona Virus appeared. Wuhan is ground zero for the Corona Virus. [See Attached Exhibit 27]

(23.)

Former Astronaut and Senator, John Glenn, tried to stop the research program from happening by promoting Legislation. Below in an excerpt from his speech to Congress.

**SENATOR JOHN GLENN TO CONGRESS:** **"Madam President, if I approached any Senator here and I said, 'You did not know it, but the last time they went to the doctor or went to the hospital, your wife or your husband or your daughter or your son became the subject of a medical experiment that they were not even told about. They were given medicine, they were given pills, they were given radiation, they were given something and were not even told about this, were not even informed about it, yet they are under some experimental research that might possibly do them harm – maybe some good will come out of it, but maybe it will do them harm also – but they do not know about it,' people would laugh at that and say that is ridiculous. That cannot possibly happen in this country. Yet, that very situation is what this piece of legislation is supposed to address…. I would like to put this on a personal level for every one of my colleagues. You just think about your own family, your own son, your own**

daughter, or grandchildren who might be, the next time they go to a doctor, the

subject of some medical experiment that they are not even told about.  **I do not**

**think there can be many things more un-American than that."**    A full copy of

Senator Glenn's speech is attached hereto as Exhibit 28.

## II. JURISDICTION AND VENUE

### (24.)

Jurisdiction is invoked pursuant to 42 U.S.C. § 1983.

Venue is proper in this Court because ALL PLAINTIFFS are United States Citizens,

residing in this District, and these causes of action arise from or are connected with Defendants'

extensive operations and activities in California State.  Further, the acts described herein by the

above-named Defendants occurred in this district and continue to occur at the time of this

writing.

This Court has personal jurisdiction over all Defendants pursuant to 28 U.S.C. § 1343 (3)

and (4), which gives district court's jurisdiction over actions to secure civil rights extended by

the United States government.

## III. PARTIES

### (25.)

The United States Department of Defense is an Executive branch department of the

federal government of the United States charged with coordinating and supervising all agencies

and functions of the government directly related to national security and the United States

Armed Forces.  The address is 1400 Defense Pentagon, Washington, DC 20301-1400

1  <u>The United States Department of Homeland Security</u> is a cabinet department of the

2  U.S. Federal Government with responsibilities in public security. The address is 2707 Martin

3  Luther King, Jr. Ave SE, Washington, DC 20528-0525

4

5

6  <u>The National Aeronautics and Space Administration</u> is an independent agency of the

7  United States Federal Government responsible for the civilian space program, as well as

8  aeronautics and aerospace research. The address is NASA Headquarters, Washington, DC,

9  20546-0001. The mail and delivery address is 300 E. Street SW, Washington DC 20024-3210.

10

11

12  <u>BOEING</u> is an American Multinational corporation that designs, manufactures and sells

13  airplanes, rockets, satellites and telecommunications equipment and missiles worldwide. The

14  address is "100 North Riverside Plaza, Chicago, Illinois 60606.

15

16  <u>Joseph Noonan, Screened Images d/b/a "Corrections.com"</u> is an online brand for the

17  global community of corrections. Joseph Noonan is an owner. The address is 15 Mill Wharf

18  Plaza, Scituate, Mass 02066.

19

20

21  <u>Tim Blake, Screened Images d/b/a "Corrections.com"</u> is an online brand for the global

22  community of corrections. Tim Blake is an owner. The address is 15 Mill Wharf Plaza,

23  Scituate, Mass 02066.

24

25

26  <u>INSITU</u> is a subsidiary of BOEING. It is an information and technology aerospace

27  company that specializes in unmanned aerial vehicles. It is located at 118 East Columbia River

28  Way, Bingen, Washington 98605.

DEVORE, SELLERS, BAN III VS. UNITED STATES DEPARTMENT OF DEFENSE, ET. AL.
COMPLAINT FOR DAMAGES AND REQUEST FOR INJUNCTIVE RELIEF

<u>L3 HARRIS</u> is an international communications and information technology company serving government and commercial markets, The address is 1025 West NASA Blvd., Melbourne, Florida 32919

<u>NORTHROP GRUMMAN</u> is an American global aerospace and defense technology company.  It is located in 2980 Fairview Park Drive, Falls Church, VA 22042

## IV.  REQUESTS FOR RELIEF

### (26.)

**WHEREFORE**, in light of the foregoing, PLAINTIFFS hereby request relief, in their favor, against Defendants, jointly and severally, including to be adjudged the prevailing party and awarded damages consistent with proof.

DEVORE, SELLERS, BAN III VS. UNITED STATES DEPARTMENT OF DEFENSE, ET. AL.
COMPLAINT FOR DAMAGES AND REQUEST FOR INJUNCTIVE RELIEF

PAGE 16

1       <u>L3 HARRIS</u> is an international communications and information technology company

2  serving government and commercial markets, The address is 1025 West NASA Blvd.,

3  Melbourne, Florida 32919

4

5

6      <u>NORTHROP GRUMMAN</u> is an American global aerospace and defense technology

7  company.  It is located in 2980 Fairview Park Drive, Falls Church, VA 22042

8

9                **IV.  REQUESTS FOR RELIEF**

10

11                   **(26.)**

12      **WHEREFORE**, in light of the foregoing, PLAINTIFFS hereby request relief, in their

13  favor, against Defendants, jointly and severally, including to be adjudged the prevailing party

14  and awarded damages consistent with proof.

15

16  ATTACHMENTS:  EXHIBITS 1-28

17

18

19

20

21

22

23

24

25

26

27

28

DEVORE, SELLERS, BAN III VS. UNITED STATES DEPARTMENT OF DEFENSE, ET. AL.
COMPLAINT FOR DAMAGES AND REQUEST FOR INJUNCTIVE RELIEF

DECLARATION AND VERIFICATION:

I, DAWN DEVORE, swear under penalty of perjury that the foregoing assertions of fact set forth in the foregoing Complaint are true and correct to the best of my knowledge.

Signed,                                          Date:

I, STEFFINI SELLERS, swear under penalty of perjury that the foregoing assertions of fact set forth in the foregoing Complaint are true and correct to the best of my knowledge.

Signed,                                          Date:

I, GEORGE ANTHONY BAN III, swear under penalty of perjury that the foregoing assertions of fact set forth in the foregoing Complaint are true and correct to the best of my knowledge.

Signed,                                          Date:

# EXHIBIT 1

DEPARTMENT OF DEFENSE - CONGRESSIONALLY DIRECTED MEDICAL RESEARCH PROGRAMS

**Contact Us (/contact) | Site Map (/sitemap)**

 (https://www.facebook.com/TheCDMRP)

(http://twitter.com/CDMRP)

(https://www.youtube.com/user/CDMRP) (/rss/funding_opportunities.xml)



(/default)

# Transforming Healthcare through Innovative and Impactful Research

Home (../default) / Research Programs (../researchprograms) / Joint Warfighter Medical

# Joint Warfighter Medical

**Vision -** *Move military relevant medical solutions forward in the acquisition life-cycle to meet the needs of Service members and other military health system beneficiaries*

The Joint Warfighter Medical Research Program (JWMRP) is a resource for the Department of Defense (DoD) to advance the outcomes of previously funded Congressional Special Interest medical research and development (R&D) projects addressing the military medical requirements of the Services. The JWMRP complements the Defense Medical R&D Program (DMRDP) by facilitating the further development of promising medical solutions through the



(annreports/17annreport.pdf)

» Click on Image to View Program Annual Report

acquisition process.

Each year, a broad spectrum of research and product development efforts are considered for funding under the JWMRP. The research is aligned to one of the six DMRDP Joint Program Committee (JPC) scientific domains listed below:

- JPC-1/Medical Simulation and Information Sciences Research Program (../dmrdp/jpc1msisrp)
- JPC-2/Military Infectious Diseases Research Program (../dmrdp/jpc2midrp)
- JPC-5/Military Operational Medicine Research Program (../dmrdp/jpc5momrp)
- JPC-6/Combat Casualty Care Research Program (../dmrdp/jpc6cccrp)
- JPC-7/Radiation Health Effects Research Program (../dmrdp/jpc7rherp)
- JPC-8/Clinical and Rehabilitative Medicine Research Program (../dmrdp/jpc8crmrp)

The U.S. Congress first appropriated funds for the JWMRP in Fiscal Year (FY) 2012. Since that time, 109 awards or award modifications have been funded through the JWMRP in two major project categories: advanced technology development projects and demonstration/validation projects. Projects in advanced technology development focus on systematic application of knowledge toward the production of potential medical solutions. Demonstration/validation projects focus on the demonstration and validation of performance parameters of potential products to support their transition toward clinical utility. By supporting both advanced technology development and demonstration/validation efforts, the JWMRP offers a pathway for transitioning promising medical solutions from the laboratory toward the clinic for the benefit of our Service members, other military health system beneficiaries, and the American public.

The JWMRP supports research projects across several research topics and disciplines. Research and product development efforts funded by the JWMRP include the following:

- Development of a transportable pathogen reduction and blood safety system
- Prototype development and testing of a miniaturized, remotely controlled, image guided surgical robot for peritoneal cavity surgery
- Development of a non-electric, disposable IV infusion pump
- Intelligent tutoring system for emergency preparedness training
- Phase III pivotal clinical trial for a Norovirus vaccine
- Phase II Malaria clinical trial with the first live attenuated vaccine against protozoal disease in humans
- Development of a passive physiological monitoring system for use during medical evacuation
- Development and clinical trial of a food supplement to prevent travelers' diarrhea
- Development and evaluation of implantable nanosensors to monitor key physiological parameters of warfighter health
- Pivotal study on the regulatory approval pathway for a drug to treat acute radiation syndrome
- Accelerating the development of the opioid Sufentanil for pain treatment
- Development of bioengineered corneas for transplantation



## Congressional Appropriations

$400 million
FY12-FY18

$50 million
FY19



## Funding Summary

126* individual projects in FY12-17

*Includes projects managed by CDMRP and other DoD organizations

Recent Applications Recommended for Funding (awards/awards)

Program Portfolio (portfolio/prgPortfolio)



## Programmatic Panels

FY19 Programmatic
Panel (panels/panels19)

Previous Years' Programmatic Panels (panels/panels)

# EXHIBIT 2

(Sec. 3001) This bill amends the Federal Food, Drug, and Cosmetic Act to require the FDA, after approving an application for a new medication, to publish a brief statement on any patient experience data or related information that was part of the application. Patient experience data is information about the impact of a medical condition or a related therapy on a patient's life and the patient's preferences for treatment.

(Sec. 3002) The FDA must issue guidance on the collection and use of patient experience data.

(Sec. 3003) The Paperwork Reduction Act does not apply to voluntary collection of patient experience data.

(Sec. 3004) The FDA must report on its use of patient experience data in regulatory decision-making.

Subtitle B--Advancing New Drug Therapies

(Sec. 3011) The FDA must establish a process to qualify drug development tools (methods, materials, or measures that aid drug development and regulatory review) as reliable for use in supporting approval or investigational use of a drug.

(Sec. 3012) The FDA may permit the sponsors of new medications that target genes or variant proteins to treat rare, serious conditions to rely upon information submitted for an approved medication that uses the same technology. To rely upon submitted information, the sponsor must have developed, or have a right of reference to, the information.

(Sec. 3013) The priority review voucher program for rare pediatric disease medications is extended until the end of FY2020. (A priority review voucher is a transferable voucher that entitles the holder to have a new drug or biological product application acted upon by the FDA within six months.)

(Sec. 3014) The Government Accountability Office (GAO) must report on the effectiveness and impact of specified priority review voucher programs.

(Sec. 3015) This bill amends the Orphan Drug Act to authorize HHS to defray all the costs of development of orphan drugs (drugs for rare conditions), instead of only certain testing expenses.

(Sec. 3016) HHS may award grants to institutions of higher education and nonprofits to study and recommend improvements to the process of continuous manufacturing of medications. (Currently, most medications are manufactured in batches.)

Subtitle C--Modern Trial Design and Evidence Development

(Sec. 3021) The FDA must issue guidance addressing the use of novel clinical trial design in the development and review of drugs.

(Sec. 3022) The FDA must evaluate and issue guidance on the use of evidence from sources other than clinical trials to support approval of a drug for a new indication.

(Sec. 3023) HHS must revise the HHS Human Subject Regulations, the FDA Human Subject Regulations, and the vulnerable populations rules to: (1) reduce regulatory duplication and unnecessary delays; (2) modernize the provisions; and (3) protect vulnerable populations, incorporate local considerations, and support community engagement.

(Sec. 3024) Clinical testing of investigational medical devices and drugs no longer requires the informed consent of the subjects if the testing poses no more than minimal risk to the subjects and includes safeguards.

Subtitle D--Patient Access to Therapies and Information

(Sec. 3031) For certain indications, the FDA may rely upon a summary of clinical data to approve a supplemental application for a medication.

# EXHIBIT 3

# 21 U.S. Code § 321. Definitions; generally

**U.S. Code**    Notes

For the purposes of this chapter—

**(a)**

**(1)** The term "State", except as used in the last sentence of section 372(a) of this title, means any State or Territory of the United States, the District of Columbia, and the Commonwealth of Puerto Rico.

**(2)** The term "Territory" means any Territory or possession of the United States, including the District of Columbia, and excluding the Commonwealth of Puerto Rico and the Canal Zone.

**(b)** The term "interstate commerce" means (1) commerce between any State or Territory and any place outside thereof, and (2) commerce within the District of Columbia or within any other Territory not organized with a legislative body.

**(c)** The term "Department" means Department of Health and Human Services.

**(d)** The term "Secretary" means the Secretary of Health and Human Services.

**(e)** The term "person" includes individual, partnership, corporation, and association.

**(f)** The term "food" means (1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article.

**(g)**

**(1)** The term "drug" means (A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any article specified in clause (A), (B), or (C). A food or dietary supplement for which a claim, subject to sections 343(r)(1)(B) and 343(r)(3) of this title or sections 343(r)(1)(B) and 343(r)(5)(D) of this title, is made in accordance with the requirements of section 343(r) of this title is not a drug solely because the label or the labeling contains such a claim. A food, dietary ingredient, or dietary supplement for which a truthful and not misleading statement is made in accordance with section 343(r)(6) of this title is not a drug under clause (C) solely because the label or the labeling contains such a statement.

**(2)** The term "counterfeit drug" means a drug which, or the container or labeling of which, without authorization, bears the trademark, trade name, or other identifying mark, imprint, or device, or any likeness thereof, of a drug manufacturer, processor, packer, or distributor other than the person or persons who in fact manufactured, processed, packed, or distributed such drug and which thereby falsely purports or is represented to be the product of, or to have been packed or distributed by, such other drug manufacturer, processor, packer, or distributor.

**(h)** The term "device" (except when used in paragraph (n) of this section and in sections 331(i), 343(f), 352(c), and 362(c) of this title) means an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is—

**(1)** recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them,

**(2)** intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or

**(3)** intended to affect the structure or any function of the body of man or other animals, and

# EXHIBIT 4

**Contains Nonbinding Recommendations**

Additional information related to how FDA intends to apply the least burdensome provisions is available in the following FDA guidances ("Least Burdensome Guidances") that discuss the principles with which the recommendations discussed in this guidance are consistent:

- The Least Burdensome Provisions:  Concept and Principles; Guidance for Industry and Food and Drug Administration Staff, dated February 5, 2019, available at https://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/UCM085999.pdf.
- Developing and Responding to Deficiencies in Accordance with the Least Burdensome Provisions; Guidance for Industry and Food and Drug Administration Staff, dated September 29, 2017, available at https://www.fda.gov/downloads/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm073680.pdf.

**B.     Available Premarket Pathways**

The appropriate premarket submission pathway for a given medical device is determined by the risks associated with the device type as well as the level of regulatory controls necessary to provide a reasonable assurance of safety and effectiveness.  The available submission pathways (e.g., premarket notification (510(k)), De Novo classification (De Novo) request, Premarket Approval (PMA) Application, or Humanitarian Device Exemption (HDE)) are briefly discussed in sections III.B.1-4 of this guidance.

When clinical evidence is necessary to support marketing authorization of a medical device, an investigational device exemption (IDE) may be necessary.[16]  An IDE allows the investigational device to be used in a clinical study in the United States in order to collect safety and effectiveness data.  An approved IDE permits a device to be shipped lawfully for the purpose of conducting investigations of the device.  FDA has published numerous guidance documents related to IDEs, which can be found at: https://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/InvestigationalDeviceExemptionIDE/ucm162453.htm.

Although a manufacturer or sponsor may submit any form of evidence to FDA in an attempt to substantiate the safety and effectiveness of a device, the Agency relies upon only valid scientific evidence[17] to determine whether there is reasonable assurance that the device is safe and effective.  After considering the nature of the device and the rules in 21 CFR 860.7, the Commissioner will determine whether the evidence submitted or

---

[16] *See* Section 520(g) of the FD&C Act (21 U.S.C. 360j(g)) and 21 CFR 812.2.
[17] Valid scientific evidence is defined as "evidence from well-controlled investigations, partially controlled studies, studies and objective trials without matched controls, well-documented case histories conducted by qualified experts, and reports of significant human experience with a marketed device, from which it can fairly and responsibly be concluded by qualified experts that there is reasonable assurance of the safety and effectiveness of a device under its conditions of use." (21 CFR 860.7(c)(2)).

# EXHIBIT 5

# PLASTIKOS

## Plastic and Reconstructive Surgery
### Susan E. Kolb, M.D., F.A.C.S.
### Julian B. Gordon, M.D.

## OPERATIVE REPORT

**NAME:** Dawn Devore

**DATE:** 8/1/2017

**PREOPERATIVE DIAGNOSIS:** Foreign body left sub-mammary area.

**POSTOPERATIVE DIAGNOSIS:** Foreign body left sub-mammary area.

**OPERATION:** Removal of foreign body left sub-mammary area.

**SURGEON:** Susan E. Kolb, M.D., F.A.C.S.

**ANESTHESIA:** EMLA cream.
1% Xylocaine with epinephrine 1:100,000 mixed 5:1 with sodium bicarb neutralizer.

**SPECIMENS:** Foreign body left sub-mammary area.

**INDICATIONS:** The patient is a 59-year-old Caucasian female with a symptomatic foreign body in the left sub-mammary area.

**DESCRIPTION OF OPERATION:** The patient was taken to the operating room and placed on the table in the supine position. Appropriate monitoring devices were attached. EMLA cream was applied. The left sub-mammary area was prepped and draped in a sterile fashion using Betadine. The area over the foreign body was marked with a marking pen. Adequate local infiltrative anesthesia was obtained with injection of the above solution. The skin was divided with a knife. Dissection proceeded down to the foreign body which was excised and sent to the lab for examination. Hemostasis was applied with pressure. The deep tissue was closed using interrupted buried 5-0 Monocryl suture. The skin was then closed using a running 5-0 fast absorbing plain gut suture. Mastisol, paper tape and sterile pressure dressing was placed and secured using paper tape.

**ESTIMATED BLOOD LOSS:** Minimal

The patient tolerated the procedure well and was returned to the recovery room in satisfactory condition.

Susan E. Kolb, M.D., F.A.C.S.

1

# EXHIBIT 6

~1237 cm-1 = same as ~1334 cm-1 above.

~1082 cm$^{-1}$ = human cervical cells. With ~1068 cm-1 and ~1082 cm-1 chalcogenide glasses (Dragons blood stone). With ~1082 cm-1 and ~870 cm-1 oreano phosphorus surface RXNS (reactions).

Note:  ~ 1082 cm$^{-1}$ = Self-assembled $SiO_2$ alpha and beta quartz.  $PO_4$ tetrahedrons in $KH_2PO_4$ as Riebeckite (blue asbestos used in nano technology) with 1042 and 1082 cm$^{-1}$ and both peaks are present in collective data.  With 1082, 179, 205 and 701 cm-1 shell of a mussel. It is used in studies of human cervical cancer.  This material was detected in the bioenergy testing utilizing hair and patch test analysis (Riebeckite).

Additional information for ~1082 cm-1 is with ~ 1540 cm$^{-1}$ in the following forms:

- Hexagonal boron nitride – modes of metallic carbon nanotubes.  Lithium – 1599, 1615, 1540 cm$^{-1}$.  1540 cm$^{-1}$ organometallic (coordination) cytochrome c "ferrous alky".

- Pyrophosphate activation in Hypoxanthine –Guanine phophoribosyltransferase with transition state analogs.

- HGPRT o ImmHp o MgPPi complexis is 1082 and 20 lowers with 981 cm$^{-1}$.

- Rosasite 1082, 1042, 1026 and 1093 cm$^{-1}$.  1082 and 1042 present in analysis data.

- Kolwezite (Cu, Co)2(CO)3(OH)2.

## CONCLUSIONS

The correlation of the data from the EDS/SEM values and the specific peaks determined from the Raman/Micro FTIR data clearly show that the specimens taken out of the body of Dawn DeVore are implantable biosensor technology.    The specific identification of peaks that were for three types of venom of sea snake(s), chalcogenide glasses/crystals, Riebeckite (asbestos nano wires), cotton DNA nano ribbons  derivatives clearly show that the specimens are from current nano remote sensory technology that make up an electro piece part system  used in the monitoring of chronic diseases such as anti-coagulatives, cancer and other chronic diseases associated with pain or paralysis (Bell's palsy).

The key use of venom(s), which were initially detected in the IHS Advanced Resonance test used for research purposes, only detected the presence of drug residue, poly-vinyl pyrrolidone, lead, organomontorillonite, Sporidesmin-Pithomyces chartarum and epidithiodioxopiperazine, 156 KD M-protein and 15,000 Daltons or 15 KD Protein. These substances were also found to match several of the Raman/MicroRaman FTIR peaks as shown in the chromatograph peak values.   Sea snake venom(s) are not as the whole molecules but as gene plasmids coupled with nano technology to develop a nano delivery system that can store at minimum 5,000 doses on nano particles.  The polymer coupling may encompass thiazole, which is actively patented by Novaris.

10

# EXHIBIT 6A





| Element | Weight % |
|---------|----------|
| O K | 33.10 |
| Na K | 1.48 |
| Al K | 0.45 |
| Si K | 0.34 |
| P K | 0.22 |
| S K | 0.95 |
| Cl K | 0.68 |
| K K | 0.14 |

Referring to the chart on the left, C=carbon, O=oxygen, Si=silicon. These are HZE ions.

SAMPLE 30615 OBJECT 1

# EXHIBIT 7

# AAA Security

## Protecting What's Important Since 1968

Findings of a computational electronic advanced subject analysis of data/signals collected during a Non-liner Junction scan, and a full Spectrum Analyzer, from 8KHz to 20GHz Frequency Monitoring Sweep, with a signal recorder running to capture any/all RF transmissions of George Ban III

Subject: George Ban III

On October 12th 2017 Approximately 7:11 PM MDT we met with George Ban III at Rented Location Quality Inn in Woodland CA. to conduct all of the listed Scans/Sweeps of his physical body with a non-linear junction detector (NLJD) and a OSCOR RF spectrum analyzer.

The equipment used in the listed procedures was developed and manufactured by Research Electronics International (REI). A full description of the equipment can be found on the REI web-sight.

████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
██████████████████████ they taunted him by telling him there was nothing he could do to protect his mother or his sister.  They even told him they were going to kill his mom. ████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
████████████████████

We were also scanning Dawn DeVore, George Ban Jr., Steffini Sellers, his aunt Diane Basgall and Albert Graney the same day, each person was scanned at separate times on October 12th 2017. No two were in the room or at the location at the same time. On the following pages of this report you will see that there are signals from George Ban III and George Ban Jr. that are close to the same frequency and similar signature or form  which could be from similar equipment.

We performed a spectrum analysis and frequency sweep earlier on October 12th 2017 from 2:09 to 3:48 to establish a base line of what should be normal in that area. The location used to perform the multiple sweeps/scans is a Motel. All cell phones, and personal items were removed from all pockets and powered off. Various power settings were used on the Orion during the sweep to scan at different depths and levels. After multiple passes our equipment indicated the following. Right hand semiconductor, right shoulder semiconductor, center of chest semiconductor, center of abdominal area semiconductor, right waist area semiconductor, left inner front thigh semiconductor/corrosive, right leg below the knee semiconductor/corrosive, center of back corrosive, left waist semiconductor, left back side of knee semiconductor, right back inside thigh semiconductor, right side neck just below the ear corrosive, center of top of head corrosive.

During the scan, the full spectrum analyzer recorded many signals in the areas of. ████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

All Procedures were performed and conducted in accordance with the National Standards as set forth and taught by Research Electronics International Corporation. All Engineers and Representatives of AAA that were involved with the procedures are trained and certified on the equipment used and procedures conducted.

# EXHIBIT 8

# AAA Security

### Protecting What's Important Since 1968

Findings of a computational electronic advanced subject analysis of data/signals collected during a Non-liner Junction scan, and a full Spectrum Analyzer, from 8KHz to 20GHz Frequency Monitoring Sweep, with a signal recorder running to capture any/all RF transmissions of Seffini Seller

Subject: Seffini Seller

On October 12th 2017 Approximately 3:26 PM PDT we met with Seffini Seller at Rented Location Quality Inn in Woodland CA. to conduct all of the listed Scans/Sweeps of her physical body with a non-linear junction detector (NLJD) and a OSCOR RF spectrum analyzer.
The equipment used in the listed procedures was developed and manufactured by Research Electronics International (REI). A full description of the equipment can be found on the REI web-sight.

Seffini Seller had informed us that she has had surgery on her chest, after the surgery she was not the same. There was something wrong with her eye. Her eye would twitch uncontrollably three months



We performed a spectrum analysis and frequency sweep earlier on October 12th 2017 from 2:09 to 3:48 to establish a base line of what should be normal in that area. The location used to perform the multiple sweeps/scans is a Motel. All cell phones, and personal items were removed from all pockets and powered off. Various power settings were used on the Orion during the sweep to scan at different depths and levels. After multiple passes our equipment indicated the following. Right side of neck just below jaw semiconductor, Left Back skull just behind left ear corrosive. Center of chest semiconductor/corrosive (this is a strange reading), left mid abdominal area semiconductor, front pelvis left and right side semiconductor, right leg inner thigh semiconductor, center of back just above appendix area semiconductor, left and right buttock semiconductor, left and righ ankle semiconductor.



All Procedures were performed and conducted in accordance with the National Standards as set forth and taught by Research Electronics International Corporation. All Engineers and Representatives of AAA that were involved with the procedures are trained and certified on the equipment used and procedures conducted.

# EXHIBIT 9

1  DAWN DEVORE, Pro Se
   15171 Victoria Lane
2  Huntington Beach, CA 92647
   707-635-3644
3
4              **UNITED STATES DISTRICT COURT**
5              ████████████████████████████████████
               ███████████████████████████
6
7  DAWN DEVORE, Pro Se                     ████████████████████████████████
8           Plaintiff,
9  vs.
10 CALIFORNIA DEPARTMENT OF              **AFFIDAVIT OF**
   CORRECTIONS AND REHABILITATION,    **JOHN KINGSTON, PROFESSIONAL**
11 ET. AL.                                **ELECTRICAL ENGINEER,**
                                           **AAA SECURITY**
12
13         Defendants                   In Support of the Complaint
14                                         of Dawn DeVore
15
16        PERSONALLY, APPEARED BEFORE ME, the undersigned authority,
17
18        **JOHN KINGSTON, PROFESSIONAL ELECTRICAL ENGINEER,**
                    **SALT LAKE CITY, UTAH**
19
20           who being first duly sworn, deposes and says:
21                              1.
22
23        My name is John Kingston.  I am a licensed professional electrical engineer for
24 AAA Security, headquartered in Salt Lake City, Utah.  I am of the age of
25 legal majority, and in all respects, I am capable and competent to execute this sworn
26 Affidavit.
27
28

1|PAGE              AFFIDAVIT OF JOHN KINGSTON
                    2:18 CV-02487-KJM-AC-PS

2.

Through education, training, and experience, I am qualified and competent to give expert testimony on the findings of computational electronic advanced subject analysis and data/signals collected during Non-linear Junction scans/frequency monitoring sweeps.

3.

Ms. DeVore was referred to me by Dr. Hildegarde Staninger®, Ph.D., RIET-1 in August 2017 for such testing to determine if Ms. DeVore may have been implanted with any electronic devices used for tracking, surveillance, etc., without her knowledge.

4.

The equipment used in the testing of Ms. DeVore was developed and manufactured by Research Electronics International (REI). This is the same equipment used by the Department of Homeland Security, the Federal Bureau of Investigations (FBI), the Central Intelligence Agency (CIA) and similar agencies around the world for this same purpose. The manufacturer of this equipment is not allowed to sell or make this equipment available to persons or agencies outside of the United States without written consent from the government.

5.

All Procedures were performed and conducted in accordance with the National Standards as set forth and taught by Research Electronics International (REI) Corporation. All Engineers and Representatives of AAA that were involved are trained and certified on the equipment used and procedures conducted.

AFFIDAVIT OF JOHN KINGSTON
2:18 CV-02487- KJM-AC-PS

6.

During the months of September 2017 and October 2017, Ms. DeVore's physical body and frequency monitoring scans were conducted on four (4) separate occasions, at four (4) different locations using a Non-Linear Junction Detector (NLJD) with full OSCOR RF (Radio Frequency) spectrum analyzer, from 8KHz to 20GHz and signal recorder running to capture any/all Radio Frequency (RF) transmissions of Dawn Devore. The locations and dates included: 1. Salt Lake City, Utah, September 19, 2017; 2. Woodland, California, October 12, 2017; 3. Ms. DeVore's home located in Elk Grove, California, October 13, 2017; and 4. Ms. DeVore's place of work, the California Department of Corrections, Elk Grove, California, October 13, 2017.

In each instance, we performed an advance spectrum analysis and frequency sweep at the site where the scans were scheduled to take place in order to establish a base line of the RF environment for the area.

Various power settings were used on the ORION during the sweeps to scan at different depths and levels. The results of these tests detected a total of eleven (11) semiconductors, four (4) corrosive readings (meaning possibly an older metal, rusted system) and two (2) readings of 'mixed signals' which could be both digital and analog. The locations of the semiconductors detected in Ms. DeVore are listed below:

1)  Left shoulder - positive signal semiconductor

2)  Back of Neck slightly to the Right - positive signal semiconductor.

3)  Chest Area - positive signal semiconductor

AFFIDAVIT OF JOHN KINGSTON
2:18 CV-02487-KJM-AC-PS

4)    Left Breast - positive signal semiconductor

5)    Right Ankle – positive signal semiconductor

6)    Left inside knee – positive signal semiconductor

7)    Right inside thigh – positive signal semiconductor

8)    Right inside calf – positive signal semiconductor

9)    Left side center of back – positive signal semiconductor

10)    Lower back left side – positive signal semiconductor

11)    Right buttocks – positive signal semiconductor

Corrosive Signals:

12)    Right ear – corrosive

13)    Top of head, forward area – corrosive

14)    Left side of neck – corrosive

15)    Back between shoulder area - corrosive

Mixed Signals:

16)    Left leg – mixed signal, inconclusive

17)    Right leg – mixed signal, inconclusive.

7.

In addition to detecting the semiconductors, the full spectrum analyzer recorded
the following relevant signals:

1) **410.802305 MHz** which is a frequency used by the International Space Station and orbiting satellites. The signal was not constantly transmitting. The signal would show up and then go away and then come back. The signal was similar to a store and transmit device where data would be collected until a buffer was full then all the data would be transmitted, however when demodulating this signal, no information or data was being transmitted that we could detect. Possibly whatever was transmitting was waiting for a handshake from a receiver. The signal was by itself and had an amplitude of 18dBm;

2) **426.574274 MHz** with a magnitude of about 10 dBm which is one of the frequencies that is common for an electron gun;

3) **1.878GHz, 1.877GHz, 1.874GHz, 1.87GHz, 1.862GHz, 1.861GHz., 807.39 MHz, 144.59 MHz** and **123.7 MHz** which were identified at Ms. DeVore's place of work on October 13, 2017, and which did not appear until Ms. DeVore arrived at work and ceased to transmit when she left. The results of this scan were forwarded to Dr. Hildegarde Staninger,® Ph.D., RIET-1, for analysis and identification of the users of these frequencies which, as I understand, were directly, or tangently linked to Ms. DeVore's employer, the California Department of Corrections and Rehabilitation.

4) **421MHz is used for public safety radio and GPS.**

The signals at 144.59 MHz and 123.7 MHz are used with Aircraft Communication, Radar and the sMRT which is a personal locator device. It should be noted that the signal at 123.7MHz **nearly doubled in strength** when Ms. DeVore arrived at work.

Below is the graph from the signals at 1.878GHz, 1.877GHz, 1.874GHz, 1.87GHz, 1.862GHz, 1.861GHz.  The blue line shows the signals that were present before Ms. DeVore arrived at work.  Yellow shows the signals that appeared when she arrived, and that also ceased when she left:



Below is the graph for the signal at 807.39 MHz commonly used for Public Safety Radio:



AFFIDAVIT OF JOHN KINGSTON
2:18 CV-02487- KJM-AC-PS

Below is the graph from the signal at 144.59 MHz used with Aircraft Communication, Radar and the sMRT which is a personal locator device.



Below is the graph from the signal at 123.7 MHz which is used with Aircraft Communication, Radar and the sMRT which is a personal locator device.



AFFIDAVIT OF JOHN KINGSTON
2:18 CV-02487- KJM-AC-PS

8.

Three (3) other signals of interest were detected when scanning Ms. Devore at her home on October 13, 2017:

1. **Signal at 3.15GHz.** We detected a suspicious signal at 3.15GHz which has been used with communications satellites. This reading was odd though because the signal was **stronger inside the house** and non-existent outside. That generally would indicate that we are closer to the **transmitter inside the house.** While demodulating the signal at 3.15GHz we found that when tuned in to it, it would play a high-pitched tone and then smoothly and slowly changed the pitch to the lowest sound.

2. **Signal at 904.5MHz .** We detected a suspicious signal at 904.5 MHz inside Ms. DeVore's home which is used with location monitoring service for mobile phones and two-way radios. The signal, however was much **stronger inside the house.** It is much weaker in the background indicating that this is **transmitting in or near the house.**

3. **Signal at 154.18MHz.** We detected a suspicious signal at 154.18MHz which is used with aircraft communications, however this signal was **greater inside the house.** This is odd as it should be stronger near the transmitter, which I would assume would be at an airport and at a -20dBm.

Signed,

JOHN KINGSTON,
Professional Electrical Engineer
AAA Security, Salt Lake City, Utah

AFFIDAVIT OF JOHN KINGSTON
2:18 CV-02487- KJM-AC-PS

Sworn to and Subscribed to before me

this _28th_ day of December 2018

[NOTARY SEAL] NOTARY PUBLIC: _Tricia Cook_



TRICIA COOK
NOTARY PUBLIC - STATE OF UTAH
My Comm. Exp. 02/10/2019
Commission # 681507

AFFIDAVIT OF JOHN KINGSTON
2:18 CV-02487- KJM-AC-PS

# EXHIBIT 10

# THE SURGERY CENTER AT NORTHBAY VACA VALLEY
## 1006 NUT TREE ROAD
## VACAVILLE, CA 95687

## OPERATIVE REPORT

**PATIENT NAME:** Sellers, Steffini
**PATIENT ACCOUNT #:** 23064
**SURGEON:** Keith Brewer, M.D.
**DATE OF OPERATION:** 10/13/16
**DATE OF BIRTH:** 09/09/1982

### PREOPERATIVE DIAGNOSES:
1. Status post breast augmentation, desiring increase in volume and change.
2. Lower abdominal lipodystrophy.

### POSTOPERATIVE DIAGNOSES:
1. Status post breast augmentation, desiring increase in volume and change.
2. Lower abdominal lipodystrophy.
3. Asymmetric implants in place.

### PROCEDURES PERFORMED:
1. Bilateral implant exchange.
2. Bilateral periareolar mastopexy.
3. Suction lipectomy, lower abdomen, inferolateral flank.

**FIRST ASSISTANT:** Miller

**ANESTHESIA:** General endotracheal.

**ANESTHESIOLOGIST:** Tomalika Paik, M.D.

**DRAINS:** None.

**SPECIMENS:** 550 mL to 650 mL of aspirate and bilateral implants.

**OPERATIVE FINDINGS:** She had been asymmetrically augmented with a 300 mL implant filled to 325 mL on the right and 350 mL filled to 375 mL on the left. The lateral pocket on the left was widely opened and did closure.

**DESCRIPTION OF PROCEDURE:** After being marked in the holding area, she was taken to the operating room where she underwent a smooth induction of anesthesia and sterile prep and drape. The lower abdomen and areas to be aspirated were infused with a tumescent solution via small stab incisions.

Attention was turned to the right breast. The central portion of the incision was opened rapidly and carried down to the pocket, which was opened and the implant was removed. This size of the implant and volume were noted.

4/23/2018                                                                Profile Kevin Miller

Appointments

- NorthBay Healthcare
-
- I want to find...
- Find a doctor
- Service **Our Doctors**
- Patients & Visitors      Doctors Home
- Support us
- Community for Primary Care
- About Accepted Health Plans
- Careers My NorthBayDoc
- Stories
-      Locations & Directions
-
-

NorthBay.org > Our Doctors > Profiles > Profile Kevin Miller

### Kevin Miller, DPM
*Podiatry (Feet),Orthopedics (Foot & Ankle),Sports Medicine,Orthopedics,Orthopedics (Joint Replacement)*



**Special Interests:**
Foot & Ankle
Ankle Replacement
Joint Replacement
Sports Medicine
Fractures

Locations:
**NorthBay Center for Orthopedics**
2500 Hilborn Road
Fairfield, CA



## Professional Profile

It's not uncommon for people take their feet for granted. We just don't think about them until they have a problem.

That's where I come in. As a doctor of podiatric medicine, I specialize in the care and treatment of injuries and disease of the foot and ankle.

I grew up on the East Coast, but the military brought me to California. As a Fleet Marine Force Corpsman at Camp Pendleton, I



4/23/2018

saw and treated a lot of foot and ankle injuries. That is what first inspired me to study podiatric medicine.

What keeps me inspired is the great need for my specialty. Everyone has feet and ankles, and they are a priority for our active lifestyles. Being active is important in the management of a lot other health problems. So my focus is to keep people up and moving, so they stay healthy.

I treat patients of all ages. The most common conditions I deal with involve the diabetic foot and wound care. With diabetic foot care, my main goal is amputation prevention. I work directly with Primary care, Endocrinology and other medical and surgical sub-specialties to achieve this goal. I also do a lot of reconstructive foot and ankle surgery, trauma care, and care of sports-related injuries.

I like to treat my patients like they are family. I'm down to earth and realistic with them about their conditions and how to take care of them. I'm a good listener and always try to empathize with what they are going through. And I try always to treat my patients how I would want to be treated.

This interaction with my patients and seeing them get better is what brings me the greatest joy in my work.

When I'm not at work, I'm usually with my family. I am married and have two young sons, so I'm often spending time with them coaching and enjoying athletics.

## Education:

Doctor of Podiatric Medicine, California School of Podiatric Medicine, Samuel Merritt University, Oakland, California.

Residency in Podiatric Medicine & Surgery , St. Mary's Medical Center, San Francisco, California

Bachelor of Science in Biology, California State University, Dominguez Hills, Carson, California.

U.S. Navy Hospital Corps, Fleet Marine Force Medical Service, Camp Pendleton, California.

4/23/2018

Profile Kevin Miller

## Professional Memberships:

- American Board of Podiatric Medicine, Diplomate
- American College of Foot and Ankle Orthopedics and Medicine, Fellow
- American College of Foot and Ankle Surgeons, Associate
- American Podiatric Medical Association
- California Podiatric Medical Association

## Languages Spoken:

English

## Hospital Affiliations:

 

| Wellness & Fitness | How You Can Help | About NorthBay | For Patients | |
|---|---|---|---|---|
| HealthSpring Fitness | Volunteer | Overview | Billing / Payments | |
| Calendar | Volunteer with Hospice | NorthBay and Mayo Clinic | Medical Records | NorthBay Healthcare: A Magnet® for Nursing Excellence! |
| News | Donate | Boards | Phone Numbers & Directions | |
| Classes | Foundation Events | Community Benefit | Utilization Management Information | For Staff |
| Support Groups | Gift Shops / Thriftique | Annual Report | | Employee Portal |
| Blogs | | Accessibility | Marketing Privacy Policy | Medical Staff Services |
| Nurse Camp | | Sitemap | | |

# EXHIBIT 11

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

# DUTY STATEMENT

SHADED AREA TO REFLECT RECLASS POSITION NUMBER ONLY

| RPA/647# | EFFECTIVE DATE: 1/30/2015 |
|---|---|

| CDCR INSTITUTION OR DEPARTMENT<br>California Correctional Health Care Services (CCHCS) | POSITION NUMBER (Agency - Unit - Class - Serial)<br>042-006-4801-003 |
|---|---|
| UNIT NAME AND CITY LOCATED<br>Program Compliance Section, Elk Grove, CA | CLASS TITLE<br>Staff Services Manager II |
| WORKING DAYS AND WORKING HOURS<br>8:00 a.m. to 5:00 p.m. (Approximate only for FLSA exempt classifications) | SPECIFIC LOCATION ASSIGNED TO<br>8260 Longleaf Drive, Elk Grove, CA 95758 |
| PROPOSED INCUMBENT (If known)<br>Dawn Devore | CURRENT POSITION NUMBER (Agency - Unit - Class - Serial)<br>042-006-8338-009 |

YOU ARE A VALUED MEMBER OF THE DEPARTMENT'S TEAM. YOU ARE EXPECTED TO WORK COOPERATIVELY WITH TEAM MEMBERS AND OTHERS TO ENABLE THE DEPARTMENT TO PROVIDE THE HIGHEST LEVEL OF SERVICE POSSIBLE. YOUR CREATIVITY AND INGENUITY ARE ENCOURAGED. YOUR EFFORTS TO TREAT OTHERS FAIRLY, HONESTLY, AND WITH RESPECT ARE CRITICAL TO THE SUCCESS OF THE DEPARTMENT'S MISSION.

Under the general direction of the Health Program Manager III, Risk Management Branch, the Staff Services Manager II (SSM II) is responsible for the effective management of the Program Compliance Section within Policy and Risk Management Services. The SSM II provides leadership and directly supervises staff performing work related to the monitoring, evaluation, and accreditation of correctional health care programs and projects. Position may require up to 25% travel.

| % of time performing duties | Indicate the duties and responsibilities assigned to the position and the percentage of time spent on each. Group related tasks under the same percentage with the highest percentage first. (Use additional sheet if necessary) |
|---|---|
| 40% | Supervises diverse technical/professional staff performing journey level work related to the monitoring, evaluation, and accreditation of correctional health care programs and projects to ensure appropriate access to care, quality of care, and continuity of care is provided to patient-inmates in compliance with laws, rules, regulations, and court mandates. Utilizes effective communication skills, effective supervisory and organizational skills, current laws, rules and regulations, and Departmental policies and procedures on a daily basis. Consults with staff and other agencies (e.g., institutions, CDCR, Prison Law Office (PLO), Office of the Inspector General (OIG), Joint Commission, *Plata* Court Experts, etc.) to coordinate, gather, compile, and disseminate information related to *Plata* Court mandated reporting requirements and the monitoring, evaluation and accreditation activities related to PLO tours, OIG medical inspections, Plata Court Experts' monitoring tours, and Joint Commission accreditation surveys. . Directs staff on requirements for all data requests and reports. Reviews, edits, and ensures data and related reports are accurate, responsive and developed in compliance with applicable policies and/or procedures. Prepares written documents/reports and ensures timely submittal of data and reports to executive staff and internal and external stakeholders. |
| 30% | Establishes short-term and long-term goals and objectives for each respective program assignment consistent with the CCHCS' strategic plan. Develops work/action plans to provide direction and focus to carry out the mission of CCHCS. Communicates department goals, objectives, priorities and expectations to staff on an ongoing basis. Manages projects and provides clear, concise information and direction to staff regarding assignments to ensure unit objectives are accomplished on schedule and within budget. Monitors work of employees to ensure quality, quantity, and timeliness of work products. Analyzes and develops solutions for complex problems related to work unit programs, procedures, business processes and/or policies to formulate solutions using analytical skills as needed. Provides information and/or direction on issues related to health care programs and services, and advises management of critical developments and impact on operations. |
| 20% | Represents the Department in formal or informal settings at meetings/conferences to obtain and/or provide information and subject matter expertise as needed. Develops budget change documents, complex analytical reports, issues papers, training and presentation materials. Reviews written documents (e.g., memos, manuals, and other job-related materials) to determine accuracy and clarity. |

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

# DUTY STATEMENT

RPA/647-

| 10% | Identifies staff training needs and provide related training to ensure staff can perform necessary tasks. Participates in the employee corrective/discipline process (e.g., verbal counseling, Employee Counseling Records, Letter of Instruction, adverse action, etc.) in order to improve employee performance or address issues of substandard performance by utilizing various resources (e.g., MOU, SPB laws and rules, departmental policies and procedures, etc.) on an as needed basis. Perform other duties as required. |
|---|---|

## KNOWLEDGE AND ABILITIES

*Knowledge of:*  Public health, mental health and health care services programs and trends; problems and procedures involved in establishing community relationships and assessing community health program needs and resources; preparation and planning for coordinated programs with local and Federal agencies, private agencies and health care providers; principles and methods of public administration including organization, personnel and fiscal management; methods of preparing reports; research and survey methods; methods and principles of medical care administration, disease and disability prevention, health promotion and medical rehabilitation; procedures, planning, implementation and monitoring of programs; design and plan for coordination of programs with Federal and local agencies; legislative processes health program administration, including program policy development, program planning and implementation, program evaluation, and use of supportive staff services; formal and informal aspects of the legislative and regulatory process.

*Ability to:*  Assist in development of public health and health care projects; apply health regulations, policies and procedures; participate in monitoring and evaluating health programs and projects; gather, analyze and organize data related to health programs; analyze administrative problems and recommend effective action; speak and write effectively; act as program liaison with staff in other programs at the Federal, State, and local level; assist in planning, conducting and evaluating of field projects; recommend and take actions on a variety of health programs, project activities, staffing and budgetary processes; analyze proposed legislation, regulations and health program standards; provide consultation and technical assistance to local agencies; serve on task forces and committees as a program representative, and manage a major complex health program; creatively utilize a variety of management techniques to resolve complex health issues and health program problems.

## DESIRABLE QUALIFICATIONS

Demonstrated ability to act independently, open-mindedness, flexibility and tact.  Work independently and take initiative to improve and create processes and solutions.  Use good judgment and take effective action.  Excellent analytical and problem-solving skills.  Excellent verbal and written communication skills.  Familiarity with state procurement processes.

## SPECIAL PHYSICAL CHARACTERISTICS

Persons appointed to this position must be reasonably expected to exert up to 10 lbs. of force occasionally and/or a negligible amount of force frequently or constantly to lift, carry, push, pull, or otherwise move objects.  Involves sitting most of the time, but may involve walking or standing for brief periods of time.

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

# DUTY STATEMENT

RPA/647-

| SUPERVISOR'S STATEMENT: *I HAVE DISCUSSED THE DUTIES OF THE POSITION WITH THE EMPLOYEE* | | |
|---|---|---|
| SUPERVISOR'S NAME (Print) Lara Saich | SUPERVISOR'S SIGNATURE | DATE 1/27/15 |

EMPLOYEE'S STATEMENT: *I HAVE DISCUSSED WITH MY SUPERVISOR THE DUTIES OF THE POSITION AND HAVE RECEIVED A COPY OF THE DUTY STATEMENT*

The statements contained in this duty statement reflect general details as necessary to describe the principal functions of this job. It should not be considered an all-inclusive listing of work requirements. Individuals may perform other duties as assigned, including work in other functional areas to cover absence of relief, to equalize peak work periods or otherwise balance the workload.

| EMPLOYEE'S NAME (Print) DAWN DeVORE | EMPLOYEE'S SIGNATURE | DATE 1-23-15 |
|---|---|---|

STATE OF CALIFORNIA – PERSONNEL ADMINISTRATION

**REPORT OF PERFORMANCE**
**FOR PROBATIONARY EMPLOYEE**

STD. 636 (REV 4/2002)

*RATER — Before marking this report, read instructions on the back.*

☑ FIRST
☐ SECOND
☐ THIRD

| NAME (Last) | First | Initial | SOCIAL SECURITY NUMBER | REPORT DATE |
|---|---|---|---|---|
| DeVore, Dawn B. | | | 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 | 11/10/15 |

| CIVIL SERVICE TITLE | POSITION NUMBER | DATE PROBATION ENDS |
|---|---|---|
| Staff Services Manager II | 042-006-4801-003 | 06/30/16 |

| DEPARTMENT NAME | DIVISION / UNIT | EMPLOYEE'S HEADQUARTERS |
|---|---|---|
| CCHCS | Risk Mgmt. Branch, Prog. Compliance | Elk Grove, CA |

**YOUR WORK PERFORMANCE WILL DETERMINE WHETHER YOU OBTAIN PERMANENT CIVIL SERVICE STATUS**

| QUALIFICATION FACTORS | RATINGS ARE INDICATED BY "X" MARKS | | | |
|---|---|---|---|---|
| | UNACCEPTABLE | IMPROVEMENT NEEDED | STANDARD | OUTSTANDING |
| 1. SKILL—Expertise in doing specific tasks; accuracy; precision, completeness, neatness, quantity. | | | | ✓ |
| 2. KNOWLEDGE—Extent of knowledge of methods, materials, tools, equipment, technical expressions and other fundamental subject matter. | | | | ✓ |
| 3. WORK HABITS—Organization of work; care of equipment; punctuality and dependability; industry; follows good practices of vehicle and personal safety. | | | | ✓ |
| 4. RELATIONSHIPS WITH PEOPLE—Ability to get along with others; effectiveness in dealing with the public, other employees, patients or inmates. | | | | ✓ |
| 5. LEARNING ABILITY—Speed and thoroughness in learning procedures, laws, rules and other details; alertness; perseverance. | | | | ✓ |
| 6. ATTITUDE—Enthusiasm for the work; willingness to conform to job requirements and to accept suggestions for work improvement; adaptability. | | | | ✓ |
| 7. COMMUNICATION—Exhibits aptitude toward good writing and verbal skills, can give concise information in working situations. | | | | ✓ |
| 8. ABILITY AS SUPERVISOR—Proficiency in training employees and planning, organizing, assigning and expediting work; leadership; understanding of and effectiveness in implementing departmental and SPB personnel management policies including equal employment opportunity and affirmative action. | | | ✓ | |
| 9. ADMINISTRATIVE ABILITY—Promptness of action; soundness of decision, application of good management practices; understanding and effective implementation of departmental and SPB personnel management policies related to equal employment opportunity and affirmative action. | | | ✓ | |
| 10. FACTORS NOT LISTED ABOVE (Use additional sheets if more space is needed.) | | | | |
| OVERALL RATING—The overall rating must be consistent with the factor ratings and comments, but there is no prescribed formula for computing the overall rating. | | | | ✓ |

COMMENTS TO EMPLOYEE—(Supervisor should include factual examples of exceptional or poor work and give suggestions as to how performance can be improved. Factor and overall ratings of unacceptable and overall ratings of outstanding must be substantiated. Use additional sheets if more space is needed.)

Dawn: You are invaluable to CCHCS in your role as the SSMII in Program Compliance. You are proactive, forward thinking, highly skilled, knowledgeable and dependable. Immediately following your appointment, you had to address some difficult personnel issues, and you did so effectively. You participated in a large hiring effort this summer and have built a skilled, competent and effective team and ensured all staff at all levels were trained appropriately in their respective jobs. You have established process and procedure documents and templates in your Section which made our fast-paced, detail-oriented work systematic for the existing and new staff. You have an extremely strong command of the complex subject matter related to the OIG inspections, the inspection tool, and the Prison Law Office. You developed critical and necessary training to prepare the field executives on the OIG processes, and no one is better suited to deliver the training and provide an orientation that you. As the managers become more skilled, I encourage you to delegate as much work as possible to the three SSMIs. You are wonderful and CCHCS is lucky to have you in the organization providing the service and expertise that you do. I thank my lucky stars every day that you accepted the SSMII position! Thank you!!

*Dawn, I couldn't agree more. You are definitely an asset to our team and you took on a difficult task with ease. Thank you for all your contributions.*

| Rater discussed report with employee | ☑ YES  ☐ NO |
|---|---|

I RECOMMEND YOU BE GRANTED PERMANENT CIVIL SERVICE STATUS
(To be checked only on Final Report. If the probationer is rejected, notification must be given as prescribed in Government Code Section 19173.)    ☐ YES  ☐ NO

| RATER'S SIGNATURE | TITLE | DATE SIGNED |
|---|---|---|
| ✗ [signature] | Chief, Risk Management Branch | 11/10/15 |

**In signing this report, I do not necessarily agree with the conclusions of the rater.**

| EMPLOYEE'S SIGNATURE | DATE SIGNED | |
|---|---|---|
| ✗ Dawn DeVore | 11-17-15 | ☐ I would like to discuss this report with the reviewing officer. |

**I concur in the ratings given by the rater. I have made no change in this report.**

| REVIEWING OFFICER'S SIGNATURE | DATE SIGNED | AS REQUESTED, REVIEWING OFFICER DISCUSSED REPORT WITH EMPLOYEE ON DATE |
|---|---|---|
| ✗ Janet Lewis | 11/12/15 | |

**DISTRIBUTION  Copies:   1—Departmental Files   2—Employee   3—Supervisor   4—Miscellaneous**

# EXHIBIT 12



# CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES

# MEMORANDUM

**To:**    All California Department of Corrections Employees

**Subject:**    *Zero Tolerance Regarding the "CODE OF SILENCE"*

The California Department of Corrections and Rehabilitation (CDCR) is only as strong as the values held by each of its employees, sworn and non-sworn. How we conduct ourselves inside our institutions and in the Central Office is a reflection of those values.

The "Code of Silence" operates to conceal wrongdoing. One employee, operating alone, can foster a Code of Silence. The Code of Silence also arises because of a conspiracy among staff to fail to report violations of policy, or to retaliate against those employees who report wrongdoing. Fostering the Code of Silence includes the failure to act when there is an ethical and professional obligation to do so.

Every time a correctional employee decides not to report wrongdoing, he or she harms our Department and each one of us by violating the public's trust. As members of law enforcement, all Correctional Officers must remain beyond reproach. The public's trust in this Department is also violated by retaliating against, ostracizing, or in any way undermining those employees who report wrongdoing and/or cooperate during investigations. There is no excuse for fostering a Code of Silence.

Your hard fought efforts to protect the public deserve recognition and the public's trust must be maintained while we take steps to ensure the Department exemplifies integrity and instills pride. Part of this effort is the immediate implementation of a zero tolerance policy concerning the Code of Silence. We will not tolerate any form of silence as it pertains to misconduct, unethical, or illegal behavior. We also will not tolerate any form of reprisal against employees who report misconduct or unethical behavior, including their stigmatization or isolation.

Each employee is responsible for reporting conduct that violates Department policy. Each supervisor and manager is responsible for creating an environment conducive to these goals. Supervisors are responsible for acquiring information and immediately conveying it to managers. Managers are responsible for taking all appropriate steps upon receipt of such information, including initiating investigations and promptly disciplining all employees who violate Department policy.

Any employee, regardless of rank, sworn or non-sworn, who fails to report violations of policy or who acts in a manner that fosters the Code of Silence, shall be subject to discipline up to and including termination.

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

P.O. Box 588500
Elk Grove, CA 95758

# Zero Tolerance Regarding the Code of Silence

I have read and understand the memo dated February 17, 2004 entitled "Zero Tolerance Regarding the Code of Silence" and agree to uphold the ethics and conduct expectations of the Department of Corrections and Rehabilitation contained therein.

_DAWN E. DeVOCE_
_____
**Employee Printed Name**

_Dawn E. DeVoce_
_____
**Employee Signature**

_10-27-08_
_____
**Date**

**STOP!:** The accompaning information for this signature page can be found by opening the worksheet an clicking the "Code of silence zero tolerance memo" hyperlink at the bottom of the inroduction Please read this information before signing this sheet!

# EXHIBIT 13

DEPARTMENT OF DEFENSE - CONGRESSIONALLY DIRECTED MEDICAL RESEARCH PROGRAMS

**Contact Us (/contact) | Site Map (/sitemap)**



(https://www.facebook.com/TheCDMRP)

(http://twitter.com/CDMRP)

(https://www.youtube.com/user/CDMRP)
(/rss/funding_opportunities.xml)



(/default)

## Transforming Healthcare through Innovative and Impactful Research

Home (../default)  /  Research Programs (../researchprograms)  /  Joint Warfighter Medical

# Joint Warfighter Medical

*Vision -* *Move military relevant medical solutions forward in the acquisition life-cycle to meet the needs of Service members and other military health system beneficiaries*

The Joint Warfighter Medical Research Program (JWMRP) is a resource for the Department of Defense (DoD) to advance the outcomes of previously funded Congressional Special Interest medical research and development (R&D) projects addressing the military medical requirements of the Services. The JWMRP complements the Defense Medical R&D Program (DMRDP) by facilitating the further development of promising medical solutions through the



(annreports/17annreport.pdf)

» Click on Image to View Program Annual Report

acquisition process.

Each year, a broad spectrum of research and product development efforts are considered for funding under the JWMRP. The research is aligned to one of the six DMRDP Joint Program Committee (JPC) scientific domains listed below:

- JPC-1/Medical Simulation and Information Sciences Research Program (../dmrdp/jpc1msisrp)
- JPC-2/Military Infectious Diseases Research Program (../dmrdp/jpc2midrp)
- JPC-5/Military Operational Medicine Research Program (../dmrdp/jpc5momrp)
- JPC-6/Combat Casualty Care Research Program (../dmrdp/jpc6cccrp)
- JPC-7/Radiation Health Effects Research Program (../dmrdp/jpc7rherp)
- JPC-8/Clinical and Rehabilitative Medicine Research Program (../dmrdp/jpc8crmrp)

The U.S. Congress first appropriated funds for the JWMRP in Fiscal Year (FY) 2012. Since that time, 109 awards or award modifications have been funded through the JWMRP in two major project categories: advanced technology development projects and demonstration/validation projects. Projects in advanced technology development focus on systematic application of knowledge toward the production of potential medical solutions. Demonstration/validation projects focus on the demonstration and validation of performance parameters of potential products to support their transition toward clinical utility. By supporting both advanced technology development and demonstration/validation efforts, the JWMRP offers a pathway for transitioning promising medical solutions from the laboratory toward the clinic for the benefit of our Service members, other military health system beneficiaries, and the American public.

The JWMRP supports research projects across several research topics and disciplines. Research and product development efforts funded by the JWMRP include the following:

- Development of a transportable pathogen reduction and blood safety system
- Prototype development and testing of a miniaturized, remotely controlled, image guided surgical robot for peritoneal cavity surgery
- Development of a non-electric, disposable IV infusion pump
- Intelligent tutoring system for emergency preparedness training
- Phase III pivotal clinical trial for a Norovirus vaccine
- Phase II Malaria clinical trial with the first live attenuated vaccine against protozoal disease in humans
- Development of a passive physiological monitoring system for use during medical evacuation
- Development and clinical trial of a food supplement to prevent travelers' diarrhea
- Development and evaluation of implantable nanosensors to monitor key physiological parameters of warfighter health
- Pivotal study on the regulatory approval pathway for a drug to treat acute radiation syndrome
- Accelerating the development of the opioid Sufentanil for pain treatment
- Development of bioengineered corneas for transplantation



## Congressional Appropriations

$400 million
FY12-FY18

$50 million
FY19



## Funding Summary

126* individual projects in FY12-17

*Includes projects managed by CDMRP and other DoD organizations

**Recent Applications Recommended for Funding (awards/awards)**

**Program Portfolio (portfolio/prgPortfolio)**



## Programmatic Panels

FY19 Programmatic
Panel (panels/panels19)

**Previous Years' Programmatic Panels (panels/panels)**



## Peer Review Participants

FY18 Peer Review Participants (reviewers/jwm18reviewers.pdf)

Previous Years' Peer Review Participants (reviewers/reviewers)

## News & Highlights

FY19 JWMRP RFI Announcement (PDF/FY19 JWMRP RFI Announcement.pdf)

FY17 JWMRP Recommended for Funding List (awards/awards)

JWMRP Program Summary Sheet (pbks/jwmrp_programsummarysheet2019.pdf)

More... (highlights)

## Vision

*Move military relevant medical solutions forward in the acquisition life-cycle to meet the needs of Service members and other military health system beneficiaries*

## Mission

*Accelerate research and development projects that have the potential to close high priority Department of Defense medical capability gaps*

## Feedback

Click here to provide feedback/comments to the JWMRP (../about/CDMRP%20Feedback%20Form-Jan2018.pdf)

Last updated Wednesday, June 5, 2019

Note: Documents in Portable Document Format (PDF) require Adobe Acrobat Reader to view, download Adobe Acrobat Reader (http://get.adobe.com/reader/).

# CDMRP

Privacy Notice (/privacynotice) · External Links/Product Disclaimers (/disclaimer) · Research Programs (/researchprograms) · Funding Opportunities (/funding/default) · Consumer Involvement (/cwg/default) · Search Awards (/search.aspx) · About Us (/aboutus)

CDMRP © 2015

 1077 Patchel Street
Fort Detrick, MD 21702-5024

 (301) 619-7071



cdmrpwebmaster@webcdmrp.org (mailto:cdmrpwebmaster@webcdmrp.org)

**About Us**

The CDMRP originated in 1992 via a Congressional appropriation to foster novel approaches to biomedical research in response to the expressed needs of its stakeholders-the American public, the military, and Congress.

 (https://www.facebook.com/TheCDMRP)  (http://twitter.com/CDMRP) 

(https://www.youtube.com/user/CDMRP) (/rss/funding_opportunities.xml)

# EXHIBIT 14

Case 8:20-cv-00563-ODW-KS    Document 1    Filed 03/19/20    Page 71 of 131    Page ID
#:71
GOP lawmakers scrutinize LightSquared - The Washington Post

The Washington Post

**Business**

# GOP lawmakers scrutinize LightSquared

By Cecilia Kang
September 15, 2011

*An earlier version of this story failed to include comment from the National Telecommunications and Information Administration. NTIA's remarks are incorporated in this version.*

Republican lawmakers Thursday called for greater scrutiny of LightSquared, a satellite venture funded by billionaire Philip Falcone, and particularly whether the Obama administration helped secure approval for the company's multibillion-dollar effort to build a wireless broadband network.

GOP staffers of the House strategic forces subcommittee accused the White House of trying to influence the testimony of an Air Force general who was speaking about the project's potential to interfere with the Global Positioning System, the satellite network relied on by the military and private industry. The staffers said Gen. William Shelton revealed in an earlier closed meeting that the White House pressured him to include language in his testimony Thursday supporting LightSquared's venture.

The Obama administration has called for more mobile services to carry a flood of smartphones and other wireless devices expected to hit the nation's limited cell-phone airwaves, and Falcone is a major Democratic donor.

The White House denied trying to influence Shelton's testimony. Col. Kathleen Cook, a spokeswoman for Shelton, also denied there was any improper influence. She said the White House, the Office of Management and Budget and the Defense Department routinely review congressional testimony and can weigh in with their own ideas to ensure consistency in policy across agencies.

And, even so, "I can assure you Gen. Shelton's testimony was his own, supported by and focused purely on documented tested results," she said.

But the episode, first reported by The Daily Beast, created new headaches for troubled Reston-based LightSquared. Lawmakers were further agitated when Federal Communications Commission Chairman Julius Genachowski decided not to appear at Thursday's subcommittee hearing. The FCC has been accused of rushing to give a provisional green-light to LightSquared.

The company defended its business and interaction with federal officials.

"Any suggestion that LightSquared has run roughshod over the regulatory process is contradicted by the reality of eight long years spent gaining approvals," said chief executive Sanjiv Ahuja in a statement. He said the company is poised to create as many as 15,000 new jobs and will put $8 billion in investments into the economy.

"We understand that some in the telecom sector fear the challenges for their business model that LightSquared presents. It's also ludicrous to suggest LightSquared's success depends on political connections. This is a private company that has never taken one dollar in taxpayer money," Ahuja said.

In the hearing, Rep. Michael R. Turner (R-Ohio), chairman of the subcommittee, said he would call for the House Oversight Committee to investigate whether LightSquared received special favors from the White House or FCC to create its network.

Case 8:20-cv-00563-ODW-KS    Document 1    Filed 03/19/20    Page 73 of 131    Page ID
#:73
GOP lawmakers scrutinize LightSquared - The Washington Post

Rep. Austin Scott (R-Ga.) also questioned the National Telecommunications and Information Administration. He said that the agency, the technology policy arm for the White House, appeared to have urged the FCC's January approval of the network, which would allow LightSquared to use satellites to create a wireless broadband network. Current wireless broadband systems are based on Earth-bound broadcast networks.

"I've been in politics for 14 years. I have never seen an agency advocate so strongly for something like this, unless there was pressure from above or a relationship that was not being disclosed," Scott said.

In a statement, NTIA said: "As we've consistently stated since January, LightSquared should not begin offering commercial service until harmful interference concerns are resolved. Our job is to serve as an honest broker of the facts and data and we owe it to all parties to resolve these issues promptly and conclusively."

Some criticized the GOP lawmakers for attempting to "politicize" LightSquared's GPS problem.

Loretta Sanchez (D-Calif.), ranking member of the subcommittee, said she wasn't troubled by Genachowski's decision not to come.

"He sent a letter and everyone can see what the chairman of the FCC has to say about this issue at this point," Sanchez said. "So we don't have to poke fingers or try to figure out people's motives or intentions."

At issue is a waiver granted by the FCC in January that allows LightSquared to operate mass-market cellphones on its network. Competitors, the GPS industry and some federal agencies warned that LightSquared's devices would interfere with signals for GPS receivers used by everyone from the military to soccer moms for navigation.



"We were caught off guard," Shelton said in the hearing. "The network was originally space-based . . . this is a very significant shift."

The FCC has downplayed the significance of the waiver, vowing that it won't allow LightSquared to operate its network until it has resolved interference problems.

LightSquared, which said it wasn't invited to attend the hearing, has since revised its business plans and said it will operate on a different part of the satellite spectrum so it won't crowd out nearby GPS receivers.

But the new plan, Shelton said, will require billions of dollars in fresh testing of antennas and receivers that could take as long as a decade.

Sen. Charles E. Grassley (R-Iowa) on Thursday said he was troubled by allegations that the White House had tried to influence Shelton's testimony. "The White House shouldn't be telling a four-star general what he can and can't say before a congressional committee on a matter of national security, especially to help the profitability of a private company," Grassley said.

The senator also has criticized the FCC for what he sees as fast-tracking LightSquared's regulatory process without settling concerns about interference with the GPS system. He said the FCC has refused to hand over documents and communications related to the company.

The FCC , however, said Grassley's Judiciary Committee doesn't oversee the agency and that it isn't proper congressional protocol to comply with such requests.

The strategic forces subcommittee wanted to explore similar issues Thursday, and Turner had asked the chairman of the FCC to appear and address the concerns.

"I consider the chairman's failure to show up today to be an affront to the House Armed Services Committee," Turner said at the hearing.

The FCC disagreed. "The chairman never refused to testify, nor did his staff make any such suggestions," said Tammy Sun, an FCC spokeswoman, in an e-mail. "To the contrary, the committee explicitly told FCC staff that they would accept a designee. We are pleased that our top technical expert was able to respond to questions today."

💬 **37 Comments**

**Cecilia Kang**
Cecilia Kang worked for The Washington Post's financial desk. She left The Post in October 2015.

Get one year of access for only **$30**

Smart one. Our work doesn't. Subscribe to support journalism you can trust.

Get one year for $30

Send me this offer

Already a subscriber? Sign in

# EXHIBIT 15

**CORONAVIRUS (COVID-19) INFORMATION - <u>More</u>**

 My Doctor Online
**THE PERMANENTE MEDICAL GROUP**

My Doctor Online | Javaid Akhter

Print Profile

# Javaid Akhter, MD
Internal Medicine

South Sacramento Medical Center

Search for a doctor or health topic

Currently accepting patients age 18 years and over.

**Choose me**

# About Me

I worked for Kaiser Permanente in Hawaii, on the beautiful island of Maui, before joining the South Sacramento Medical Center in 2011.  Previous to Hawaii, I worked in Pakistan and the middle east for 10 years.  My training in the United States was at the University of Wyoming in Casper, after which I worked with a Mayo Clinic affiliated practice in southern Minnesota.   Extended family brought me to Sacramento.

## My Gender

Male

Show Less

## Languages

English

Interpreter Services Available

## My Training, Certifications and Licensing

### Medical Education

Dow Medical College, Karachi, Pakistan

### Residency

University of Wyoming Family Medicine Residency Program, Casper, WY

Show More

# Resources for my Patients

Disea and..

Learn about

Quicl links.

See additi

Tools and..

Take advan

Form

Get quest

# Offices & Directions

South Sacramento Medical Center

**Location**

2nd Floor
6600 Bruceville Road
Sacramento, CA 95823

**Department**

Adult Medicine

**Phone numbers**

916-688-2106

Medicine B is located in Room 211 on the 2nd floor of Medical Office Building 1.

Our department hours are Monday through Friday, 8:30 am to 5:00 pm (closed during lunch from 12:30 pm to 1:30 pm)

**See also**

South Sacramento Campus Map

Copyright © 2009-2020 The Permanente Medical Group, Inc. All rights reserved.

# EXHIBIT 16

- Exhibit 4

| ENERGY FIELD ANALYSIS | |
|---|---|
| | |
| Dawn Devose | May 15, 2017 |
| Integrative Health Systems, LLC | Heir |
| Fox M1 protein Study (All Normal) | Intensity |
| | Neg -Best <0.3-100.0(worst) |
| Parameter | Pos-Best >99.7- 0.0(worst) |
| Fox M1a | >99.7 |
| Fox M1b | |
| Fox M1c | |
| Cyclin-Cdk-dependent phosphorylaiton protein | |
| 331 amino acid MAPK (FOX M1C) | |
| 704 amino acid MAPK (FOX M1C) | |
| 376 amino acid Chk2 phosphorylation site (FOX M1C) | |
| 600 amino acid Cyclin/cdk2 phosphorylation site (FOX M1C) | |
| 611 amino acid Cyclin/cdk2 phosphorylation site (FOX M1C) | |
| 639 amino acid Cyclin/cdk2 phosphorylation site (FOX M1C) | |
| | >99.7 |
| Mitogenic signal protein kinases – Raf/MEK/MAPK low | |
| G2-M-specific gene cluster protein – activated | |
| High-risk human papillomavirus-16 (HPV-16) E7 protein | |
| Amplification Protein 12p13 | |
| | >99.7 |
| | >99.7 |

Integrative Health Systems, LLC
416 S/4th N. Larchmont Blvd.
Los Angeles, CA 90004
Tel 323-460-2630  Fax 323-460-2774



Exhibit 4a

Home (/) / Genes / FOXP1

## FOXP1 (Forkhead box P1)

### Summary of FOXP1

This gene encodes a protein that regulates gene transcription. Mutations can cause autism and leukemia (R (https://ghr.nlm.nih.gov/gene/FOXP1)).

⬆ ⬇ 0 users want this gene increased, 0 users want it decreased

### The Function of FOXP1

Isoform 8: Involved in transcriptional regulation in embryonic stem cells (ESCs). Stimulates expression of transcription factors that are required for pluripotency and decreases expression of differentiation-associated genes. Has distinct DNA-binding specifities as compared to the canonical form and preferentially binds DNA with the sequence 5'-CGATACAA-3' (or closely related sequences) (PubMed:21924763). Promotes ESC self-renewal and pluripotency.

### Protein names

**Recommended name:**
Forkhead box protein P1
**Short name:**
MFH
**Alternative name(s):**
Mac-1-regulated forkhead

| FOXP1 SNPs | + |
|---|---|
| Top Gene-Substance Interactions | + |
| FOXP1 Interacts with These Diseases | + |
| Substances That Increase FOXP1 | + |
| Substances That Decrease FOXP1 | + |
| Advanced Summary | + |
| Conditions with Increased Gene Activity | + |
| Conditions with Decreased Gene Activity | + |
| Technical | + |

(/)

SelfDecode is a personalized health report service, which enables users to obtain detailed information and reports based on their genome. SelfDecode does not treat, diagnose or cure any conditions, but is for informational and educational purposes alone.

## Policies

Terms of Service (/page/terms-of-service/)

Platform Consent (/page/platform-consent/)

## Contact

Support (mailto:support@selfdecode.com)

## Navigation

Homepage (/)

DNA Wellness Reports (https://get.selfdecode.com/gene-reports/nm/general/)

Personalized Genetics Blog (/blog/)

Privacy Policy
(/page/privacy/)

About Us (/about/)

Login (/accounts/login/)

Disclaimer
(/page/disclaimer/)

**Analyze My Genes (/#analyze-my-genes)**

SelfDecode © 2019 All Rights Reserved

# EXHIBIT 17

- Article
- Open Access
- Published: 08 February 2017

# Laser-plasma-based Space Radiation Reproduction in the Laboratory

B. Hidding✉, O. Karger, T. Königstein, G. Pretzler, G. G. Manahan, P. McKenna, R. Gray, R. Wilson, S. M. Wiggins, G. H. Welsh, A. Beaton, P. Delinikolas, D. A. Jaroszynski, J. B. Rosenzweig, A. Karmakar, V. Ferlet-Cavrois, A. Costantino, M. Muschitiello & E. Daly

*Scientific Reports* **7**, Article number: 42354 (2017)

613 Accesses

15 Citations

190 Altmetric

Metrics

## Abstract

Space radiation is a great danger to electronics and astronauts onboard space vessels. The spectral flux of space electrons, protons and ions for example in the radiation belts is inherently broadband, but this is a feature hard to mimic with conventional radiation sources. Using laser-plasma-accelerators, we reproduced relativistic, broadband radiation belt flux in the laboratory, and used

this man-made space radiation to test the radiation hardness of space electronics. Such close mimicking of space radiation in the lab builds on the inherent ability of laser-plasma-accelerators to directly produce broadband Maxwellian-type particle flux, akin to conditions in space. In combination with the established sources, utilisation of the growing number of ever more potent laser-plasma-accelerator facilities worldwide as complementary space radiation sources can help alleviate the shortage of available beamtime and may allow for development of advanced test procedures, paving the way towards higher reliability of space missions.

Download PDF⤓

# Introduction

Radiation hardness assessment of onboard electronics – an essential part of every space mission – is ideally achieved by reproducing the mission-specific space radiation environment as accurately as possible[1,2]. Testing in space would be the most realistic method, but is mostly cost prohibitive. Conventional accelerators such as linacs and cyclotrons are used instead, which produce well defined, but monoenergetic electron, proton and ion flux. However, space radiation for example in the form of "killer" electrons[3,4,5] is very broadband, generally describable by power law or exponential functions[2]. While the production of monoenergetic beams is challenging with laser-plasma-accelerators[6,7,8,9,10] (LPAs), in contrast producing broadband radiation is the inherent regime of LPAs[11,12], a unique ability which could be exploited for the benefit of the space radiation testing community[13,14,15].

# Results

Here we report on experiments, in which broadband space–level electron and proton flux was produced with LPAs having peak laser powers in the P ~ 150 TW to PW range. NASA's AE8/AP8 and AE9/AP9 models[16] were used to calculate the typical electron and proton flux at different orbits in the van-Allen belts. As a showcase, the electron spectral flux at the important GPS satellite orbit in the outer van-Allen belt is given in Fig. 1(a).

**Figure 1: Electron flux in the inner van Allen belt according to the NASA AE9 model at various orbits.**



In (**a**), the flux on GPS orbit is given via contour plots as a function of orbital time, and in (**b**) the maximum spectral flux on various orbits from LEO to HEO is plotted, demonstrating the broadband energy range up to $E$ ~ 10 MeV. The GPS electron spectrum at maximum flux from (**a**) is shown in (**b**) with the orange plot, and is used as a showcase for the experiments. The flux axis is logarithmic, indicating that the shape can often be approximated by exponential distribution functions.

To reproduce this broadband van-Allen belt level electron spectral flux, a university lab scale Ti:Sapphire laser[17] at a power level of P ~ 150 TW was used. The laser pulses were focused to spot sizes in the range of a few $\mu m^2$ on thin metal foil targets, corresponding to interaction intensities of $I \approx 10^{18}$–$10^{20}$ W $cm^{-2}$. Such laser-overdense plasma interaction is one of the most effective and reliable methods to convert laser energy into broadband electron flux, and also into protons via the TNSA mechanism[18]. In this scenario, it is well known that the resulting energy E of the accelerated electrons can be approximated by an exponential distribution $N = N_0 \exp(-E/k_B T)$, where N is the number of electrons, $k_B$ is the Boltzmann constant and T the electron temperature. Established scalings by Wilks[19], Beg[20] and Kluge[21], refined by particle-in-cell-simulations, were used to predict the effective temperature $T_{eff} = k_B T$ as a function of laser intensity on target. By adjusting the laser intensity to values of $I \approx$ few $10^{19}$ W $cm^{-2}$, the exponential electron flux was tuned to match the electron spectrum as present in the van Allen belt, e.g. $T_{eff} \approx 0.6$ MeV on the GPS orbit. Figure 2 illustrates the experimental setup. The laser–foil interaction produces broadband particle radiation, which was monitored with state-of-the-art diagnostics and was used to irradiate various commercial and radiation-hardened optocouplers as devices under test (DUT), see Methods section.

**Figure 2: Experimental setup with 150 TW Ti:sapphire laser.**



The laser-solid-interaction produces broadband, broad-angle particle radiation with electrons in the 1–10 MeV range; protons are eliminated by a thin protection foil directly in front of the DUTs (not shown here, see methods). The electrons irradiate optocouplers (located 5 cm away from the target foil) and are then detected on an image plate stack to retrieve the spatially resolved temperatures and divergence. The high-resolution shadow of the optocouplers on a front image plate is demonstrated on the right hand side; single optocoupler pins and detailed internal structure of the devices are clearly resolved. A central hole allowed on-axis electrons to enter a permanent magnet spectrometer where simultaneous measurement was obtained on an additional image plate, and a Lanex scintillating screen.

Figure 3 demonstrates the successful reproduction of GPS-level electron flux at a laser intensity $I \approx 4.5 \times 10^{19}$ W cm$^{-2}$, producing electron flux with $T_{eff} \approx 0.65$ MeV. The agreement is especially good at the medium energy range, which is particularly important, whereas the number of high energy electrons is low due to the exponential decrease, and the numerous low energy electrons on the other hand would be absorbed by the spacecraft shielding.

# EXHIBIT 18

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
500 I STREET, SACRAMENTO, CA 95814

DAWN DEVORE,

          Plaintiff,

vs.

CALIFORNIA DEPARTMENT OF CORRECTIONS,

ET.AL

         Defendant

Case No.: 2:18-CV-02487-KJM-AC

**AFFIDAVIT OF
DR. RIMA E. LAIBOW, M.D.,
IN SUPPORT OF THE
COMPLAINT AND REQUEST
FOR PRELIMINARY
INJUNCTIVE ORDERS FOR
DAWN DEVORE**

1.    My name is Dr. Rima E. Laibow, M.D., License # 111813-A. I am a medical doctor and psychiatrist, in good standing. A copy of my biography and curriculum vitae are attached hereto as Exhibit 1.

2.    I am the founder and Medical Director of "Natural Solutions Foundation" an international, non-governmental organization, active and registered in several countries, and a not-for-profit 501 (c) (3) tax exempt organization in the United States, focused on discovering, developing, documenting, demonstrating and disseminating natural solutions.

3.      I am of the age of legal majority, and in all respects, I am capable and competent to execute this Affidavit under provisions of applicable laws.

4.      Ms. Dawn DeVore is a client of mine and has been under my care since September 2017. I am an expert witness in her case presently before this court.

5.      Presenting with serious medical complaints and having sought protection at work with little to no success, at my request, Ms. DeVore underwent diagnostic testing to determine the nature of her severe illnesses and injuries and toxicological risk assessment related to her extended exposure to both ionizing and nonionizing electromagnetic radiation in her workplace and at her home, from the electronic inputs implanted in her body (some of which have been removed and characterized, others of which remain and cause on-going harm) together with radioactive and carcinogenic materials.  The Toxicological Risk Assessment, conducted together with Dr. Hildegarde Staninger®, Ph.D., RIET-1  includes carcinogenesis risk analysis of the underlying toxicology with respect to both genotoxic[1] and epigenetic[2] carcinogens. The results are used following standard, recognized methodologies as the basic parameters to determine the Toxicological Risk Assessment during real time exposures, as a direct correlative assessment for the assertion of "minimal risk" to acute and/or chronic systemic toxicity as correlated through biological systems for disease correlations.

---

[1] The property of chemical agents that damages the genetic information within a cell causing mutations, which may lead to cancer.

[2] Nongenetic influences on gene expression.

PAGE | 2

6.      The results of the diagnostic tests confirmed high levels of radioactive materials present in Ms. DeVore's body, including Uranium, thorium, vanadium, and other radioactive decay and radioactive fallout materials, and the presence of radioactive ligands which are used to generate and enhance the signals for research purposes implemented in the absence of Ms. DeVore's informed consent. Additional diagnostic tests confirm arsenic, cyanide, asbestos, and mercury and lead poisoning and elevations of the abnormal compounds Heptacarboxyporphyrin and Hexacarboxyporphyrin which are consistent with the toxic effects of arsenic or certain organotoxins. Elevation(s) of Pentacarboxyporphyrin, Precoproporphyrin and Coproporphyrin III were found which are associated with the toxic effects of mercury. Ms. DeVore also had elevated levels of Coproporphyrin III which is associated with the toxic effects of lead.

7.      Ms. DeVore has been monitored since 2017 documenting high levels of lead which may also be reflective of the encapsulation of radioactive materials as forms of depleted uranium, its degradation products, encapsulated radon gas and/or radioactive isotopes of lead, such as Pb204, Pb206, Pb207, and Pb208. The importance of a radioactive source being present in this mixture of cancer initiators is that it will accelerate the outcome, if not rendered harmless. Interestingly, tests also showed the presence of gadolinium, a toxic metal used as a contrast medium to increase visualization of tissues during an MRI scan. Ms. DeVore has never had an MRI with contrast.

8.      Ms. DeVore's Blood tests demonstrated the presence of elevated Anti-Nuclear Antibodies (ANA) with a speckled pattern meaning the toxic materials or pathogens went through the cell's nuclear membrane which can result in altered or gene mutations indicating potential premalignancy or malignancy. Tests further showed an increase in M Protein typically

pathognomonic of an asymptomatic, premalignant condition called "monoclonal gammopathy of undetermined significance" (MGUS). MGUS is associated with a lifelong, low, yet non-negligible, risk of progression to multiple myeloma (MM) or a related plasma cell dyscrasia[3], which has been directly connected to radiation exposure and for which there is no cure. Ms. DeVore's red blood cell count was abnormal and low, which is a known result following radiation exposure.

9.      Other tests showed high levels of Protein I which is associated with venomous animals, such as sea snake venom. Ms. DeVore has never given her Informed Consent to be implanted with advanced materials impregnated with sea snake venom. Yet when a sensor was surgically removed from her body, the advanced materials analysis carried out on the sensor documented the presence of this dangerous and exotic toxin. Additionally concerning, human cervical cells were detected, which is highly unusual since Ms. DeVore has not had a cervix for 20+ years following a total hysterectomy. Ms. DeVore also tested positive for P19ARF which is "mouse protein," man-made cell lines" and radioactive ligands which are all used for biomedical research.

10.     These materials, coupled with the presence of M-protein - as well as high energy levels of viruses identified - are the required parameters to increase the risk of cancer from the presence of pre-carcinogens and proximate carcinogens that create carcinogenic electrophilic hydrocarbon reactants to form the ultimate carcinogens through altered nucleic acids or proteins, or both as illustrated in a positive ANA value with the presence of specific needed parameters. The importance of the design of the immunological sensory network system is that

---

[3] Dyscrasia refers to a disease or disorder, usually of the blood.

the M-protein may be utilized to monitor radiation effects and its direct relationship to the initiation of cancer. Taken together, there is clear and convincing evidence of radiation and cancer experiments being conducted on Ms. DeVore.

11.    Ms. DeVore is suffering from acute and chronic radiation poisoning, and heavy metals poisoning which has already damaged her vital organs.  Evidence of this is Ms. DeVore has developed non-genetic "porphyria" secondary to her exposure to radiation and heavy metals poisoning which is a disorder of heme biosynthesis which gives hemoglobin the ability to bind oxygen to it.  The combined effects include the symptoms Ms. DeVore complains of which are made worse by the radical increase in the power of the electromagnetic radio frequencies received into her body while she was at work and also at home.   According to expert documentation in professional reports, the electromagnetic radiation to which Ms. Devore was being exposed to at her place of work "nearly doubled" when she arrived at work.  According to generally accepted science, this constant influx of electromagnetic radiation continually excites the cells and accelerates the mechanism that produces cancer risks which are currently estimated at 5 million times greater because of her exposures.

12.    Because of the astonishingly elevated levels of radiation to which Ms. DeVore was repeatedly exposed, her chances of developing long term chronic diseases like cancer are elevated by millions of times over normal, even in a population where approximately ¼ of all individuals will develop cancer. This means that it is a virtual certainty that the toxic environment of Ms. DeVore's job, which went unchecked and unabated and continues to this day has assured that Ms. DeVore WILL develop one or more malignancies.  For these reasons, immediate

1    restraining orders to stop these experiments and radio transmissions are critical to Ms. DeVore's
2    potential survival.
3
4    13.    As I understand it, Ms. DeVore requested, as is her right, as did Toxicological Experts, an
5    OSHA inspection and monitoring of her body. She also reported and asked her employer for
6    assistance. As I further understand, her employer ignored her legitimate complaints and the
7    inspections, and medical tests were never ordered by her employer or completed by CALOSHA
8    causing delays in the early detection and intervention of potentially lethal disease processes. The
9    consequences of this delay may be life-threatening ones as referenced throughout this
10   document and the reports of damage already done to her
11
12
13   14.    Ms. DeVore's employer refused, over a considerable time, to investigate the documented
14   hazardous conditions of her employment, which they were made aware of, and which may now
15   reasonably be considered causal for Ms. DeVore's severe injuries and illness.
16
17   15.    Ms. DeVore was forced to work in a highly hazardous and incorrectly secured and
18   managed workplace. Ms. DeVore repeatedly requested CALOSHA assistance in determining the
19   specific cause of the hazards (detection of the nonionizing radiation in the radio frequencies and
20   their operators) to which she was being exposed through the negligence and complicity of her
21   employer and its agents causing her emotional, neurological, physiologic, immunologic,
22   hematologic and other damage as demonstrated by independent laboratory examination and,
23   eventually specific industrial environmental testing. This testing confirmed conclusively that her
24   workplace was being maintained in a seriously unsafe and unlawful manner which continued to
25   expose Ms. DeVore to these hazardous conditions which may now reasonably be considered
26   causal for Ms. DeVore's severe injuries and illness.
27
28

PAGE | 6

16.    As I further understand, it was determined that the operators of the frequencies causing Ms. DeVore's severe injuries in her workplace were contractors operating inside California prisons and when Ms. DeVore learned this, her employer attempted to allege Ms. DeVore suffered from some "mental malady" (it was all in her head) in an effort to evade liability which further delayed detection and treatment.

17.    At the same time, Ms. DeVore was in the highly demoralizing, emotionally devastating and situationally difficult position of trying to remain an excellent professional with high standards and significant responsibilities in the environment of an organization which demonstrated its indifference to her health, safety, well-being and, in fact, to her survival.

18.    It is reprehensible that her employer and the regulatory agency Cal OHSA failed in their duties to protect Ms. DeVore and outrageous that her employer fired her in an attempt to evade liability.  This is shocking to the conscience.

19.    Ms. DeVore requires immediate restraining orders and immediate medical attention including but not limited to intravenous therapies, hyperbaric oxygen and chelation therapy to help reduce the body burden, and surgical removal of the biomedical electronic devices.  Ms. DeVore will also require medical monitoring that needs to start immediately.   I have prepared a treatment plan outlining the modalities and related costs which was provided to Ms. DeVore for inclusion in her Complaint and Request for Preliminary Injunctive Orders.

20.    I stand ready to provide this Honorable Court with any additional information needed to assist my patient, Ms. Dawn DeVore, which Ms. DeVore urgently requires and amply deserves.

Signed:



Rima E. Laibow, M.D.

PAGE | 7

SWORN TO AND SUBSCRIBED TO BEFORE ME

THIS 12 DAY OF December 2018.

[NOTARY SEAL] NOTARY PUBLIC

My Commission Expires:  10-18-2021





THALIA GUZMAN
Notary Public, State of Arizona
Pima County
My Commission Expires
October 18, 2021

PAGE | 8

# EXHIBIT 19



Congressional
Research Service
Informing the legislative debate since 1914

# Spectrum Policy: Provisions in the 2012 Spectrum Act

**Linda K. Moore**
Specialist in Telecommunications Policy

March 12, 2014

Congressional Research Service

7-5700
www.crs.gov
R43256

# Summary

The Middle Class Tax Relief and Job Creation Act of 2012 (P.L. 112-96, signed February 22, 2012) contained provisions in Title VI that expedite the availability of spectrum for commercial mobile broadband. The provisions in Title VI—also known as the Public Safety and Spectrum Act, or the Spectrum Act—cover reallocation of spectrum, new assignments of spectrum rights, and changes in procedures for repurposing spectrum used by the federal government. The act established a process for television broadcasters to release spectrum licensed to them for auction as commercial licenses. The act also included provisions to apply future spectrum license auction revenues toward deficit reduction; to establish a planning and governance structure to deploy public safety broadband networks, using some auction proceeds for that purpose; and to assign additional spectrum resources for public safety communications.

Broadband capacity to support popular mobile services and devices, such as real-time viewing of video on smartphones, can be improved in several ways. Examples include (1) providing new spectrum for networks to expand; (2) investing in denser infrastructure; (3) developing new technologies, or (4) expanding opportunities for sharing spectrum. Provisions of the Spectrum Act focus on increasing the amount of spectrum as the key policy tool for spectrum management.

Current legislation to improve access to spectrum includes the Rural Spectrum Accessibility Act of 2013 (S. 1776, Senator Klobuchar), the Efficient Use of Government Spectrum Act of 2013 (H.R. 2739, Representative Matsui), and the Federal Spectrum Incentive Act of 2013 (H.R. 3674, Representative Guthrie). The Rural Spectrum Accessibility Act would require the Federal Communications Commission to establish a program that would allow qualified license holders to disaggregate spectrum holdings in order to make unused spectrum available to small carriers or carriers serving rural areas, as defined by the act. The Efficient Use of Government Spectrum Act would require the timely release of additional spectrum, currently in use by the Department of Defense, for shared use or auction. The Federal Spectrum Incentive Act would clarify that federal spectrum users are eligible to participate in incentive auctions similar to what is being implemented for television broadcasters. The act would cover both shared spectrum and spectrum cleared for auction.

Going forward, other policy tools may need to be considered in order to make spectrum access more inclusive. Many policy makers and Members of Congress are concerned, for example, that the current structure of auctions to assign spectrum licenses does not provide enough opportunities for competition or new entrants into mobile communications markets. These concerns include the availability of spectrum for uses such as telemedicine or driverless vehicles. The spectrum needs of emerging technologies that some believe may be key drivers of future economic growth are not specifically addressed in the Spectrum Act and appear to receive scant attention from policy makers. In addition to autonomous vehicles, growth industries that are, at least in part, spectrum dependent include advanced robotics, cloud computing, and machine-to-machine communications (the Internet of Things).

# EXHIBIT 20

Case 8:20-cv-00563-ODW-KS   Document 1   Filed 03/19/20   Page 103 of 131   Page ID #:103

2/14/2020    Ten Year Plan and Timetable to Make Available 500 Megahertz of Spectrum for Wireless Broadband (President's Spectrum Plan Report) | Natio…



National Telecommunications and Information Administration

United States Department of Commerce

Home » Publications

# Ten Year Plan and Timetable to Make Available 500 Megahertz of Spectrum for Wireless Broadband (President's Spectrum Plan Report)

Topics: **500 MHz Initiative   Spectrum Management**

🖶 Printer-friendly version

October 29, 2010

**Abstract:**

To promote economic growth and unleash the potential of wireless broadband, President Obama unveiled an initiative to reform spectrum policy and improve America's wireless infrastructure. In June 2010, the President signed a Memorandum calling for the National Telecommunications and Information Administration (NTIA), in collaboration with the Federal Communications Commission (FCC), to make 500 megahertz of spectrum available for fixed and mobile wireless broadband in the next ten years. This will improve America's economic competiveness, create jobs and help maintain America's leadership role in technological innovation. This report outlines the plans and milestones to achieve the President's 500 megahertz goal. The release of this roadmap together with NTIA's Fast Track Evaluation marks the successful completion of a critical step in the process of freeing up 500 megahertz for use by wireless broadband.

- **Ten Year Plan and Timetable to Make Available 500 MHz of Spectrum for Wireless Broadband**

See also:

- **An Assessment of the Near-Term Viability of Accommodating Wireless Broadband Systems in the 1675-1710 MHz, 1755-1780 MHz, 3500-3650 MHz, and 4200-4220 MHz, 4380-4400 MHz Bands**

- **NTIA Fact Sheet on Spectrum Plan and Timetable, Fast Track Evaluation**

- **Letter Regarding Reallocation of 115 MHz of Spectrum** (01-19-2011)

- **Press release: NTIA Takes Next Step in 500 MHz Wireless Broandband Initiative**

# EXHIBIT 21

The FDA must classify a medical device accessory based on its intended function, not based on the classification of the medical device with which it is used.

Subtitle G—Improving Scientific Expertise and Outreach at FDA

(Sec. 3071) The bill revises the Silvio O. Conte Senior Biomedical Research Service to: (1) increase the limit on the number of members, (2) expand eligibility for appointment, (3) set a maximum pay rate, and (4) remove the option for members to contribute to the retirement system of an institution of higher education.

(Sec. 3072) The bill grants the FDA additional hiring authority for scientific, technical, or professional positions that support the development, review, and regulation of medical products.

(Sec. 3073) The FDA must establish one or more Intercenter Institutes. Each institute must coordinate activities applicable to a major disease area among the FDA centers that review products.

(Sec. 3074) Scientific meetings directly related to the duties of a HHS professional must not be considered conferences for purposes of certain reporting requirements and restrictions on conference travel.

(Sec. 3075) The bill revises provisions regarding: (1) FDA screening of the Adverse Event Reporting System, and (2) evaluation of elements to assure safe use of drugs.

(Sec. 3076) The bill revises provisions regarding the Reagan-Udall Foundation for the FDA's Board of Directors membership, Executive Director compensation, and accounting.

Subtitle H—Medical Countermeasures Innovation

(Sec. 3081) HHS must ensure the issuance of timely and accurate guidelines regarding the use of medical products for countering public health emergencies or material threats. HHS must report on funding for procurement of medical countermeasures when available funds are below a specified amount.

(Sec. 3082) The Biomedical Advanced Research and Development Authority's (BARDA's) contracting authority for procurement of medical countermeasures under Project BioShield is codified.

(Sec. 3083) The Office of the Assistant Secretary for Preparedness and Response must annually publish its budget plan for medical countermeasures.

(Sec. 3084) BARDA may enter an agreement with an independent, nongovernmental nonprofit to foster and accelerate the development and innovation of medical countermeasures and related technologies. BARDA must direct and oversee the nonprofit's work and ensure transparency and accountability.

(Sec. 3085) BARDA's procurement of medical countermeasures no longer requires Presidential approval or an agreement between HHS and the Department of Homeland Security.

(Sec. 3086) The FDA must award, upon approval, a priority review voucher to the sponsor of a drug or biological product that: (1) is a significant improvement in the prevention, diagnosis, or treatment of a serious condition; and (2) can be used as a medical countermeasure to a material threat. The transferable voucher entitles the holder to have an application for a new medication acted upon by the FDA within six months. The FDA may not issue vouchers after FY2023.

(Sec. 3087) The Paperwork Reduction Act does not apply to voluntary collection of information during a public health emergency or while determining whether there is a public health emergency.

(Sec. 3088) The bill revises provisions regarding FDA authorization of emergency use of unapproved products to include animal drugs and veterinary feed directive drugs.

Subtitle I—Vaccine Access, Certainty, and Innovation

# EXHIBIT 22

Dawn DeVore
15171 Victoria Lane
Huntington Beach, Ca 92647
707-635-3644
Dawndevore1@gmail.com

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
### 500 I STREET, SACRAMENTO, CA 95814

| | |
|---|---|
| PLAINTIFF'S NAME, | Case No.: 2:18-CV-02487-KJM-AC |
| DAWN DEVORE, | |
| vs. | **AFFIDAVIT OF** |
| | **DR. HILDEGARDE STANINGER, PH.D., RIET-1** |
| DEFENDANT'S NAME, | |
| DEPARTMENT OF JUSTICE, ET.AL. | **IN SUPPORT OF** |
| | **REQUEST FOR RESTRAINING ORDERS** |

1.

My name is Dr. Hildegarde Staninger®, Ph.D., RIET-1 (RIET herein having the meaning that I am the first Registered Industrial Environmental Toxicologist since the beginning of this classification and certification).

2.

I am over the age of 21 and in all manner and respects competent to make this Affidavit.

3.

I am a forensic scientist with a doctorate in Toxicology; Certified Industrial Environmental Toxicologist; Certified Compliance Safety Officer; Graduate OSHA (Occupational Safety and Health Administration) Institute; and Doctor of Integrative

1  Medicine.  I am nationally recognized as an authority in the field of Industrial Toxicology by

2  academia and federal and state regulatory agencies in that I authored "The Comprehensive

3
4  Handbook of Hazardous Materials, Safety, Monitoring, and Regulations" which is the university

5  required text for the Industrial Hygienist/Environmental Health Degree/Training Programs, and

6  the reference text used by the United States Department of Labor, Occupational Safety and

7  Health Administration for their new "1910.1200 Hazard Communication Standard for

8  Identification of Hazardous Chemicals for Small Businesses."  My relevant certifications

9
   include: (1) Industrial Toxicologist and Doctor of Integrative Medicine; (2) International
10
11  Environmental Intelligence Agency (IEIA) BioEnergy Field Professional Cert. No.

12  20150911005; (3) Registered Industrial Environmental Toxicologist Cert(s) No.: RIET-1; (4)

13  IEIA Nanophotonics and Computational Toxicology Certification.  NREP Certified

14
   Environmental and Safety Compliance Officer Cert No.: 7774709608161213.
15

16                                        4.

17         My clientele includes private individuals and state and national law enforcement

18  agencies in cases where foul play is suspected using exotic and designer poisons.

19
                                          5.
20
21         Ms. Dawn DeVore is a client of mine since April 2017, at which time

22  Ms. DeVore sought my services related to her claims that she is a victim of nonconsensual

23  government-sponsored experiments.

24                                        6.

25         I am an expert witness in her case presently before this court:  CASE NO.: 2:18

26  CV-02487-KJM-AC.

27

28

   AFFIDAVIT OF DR. HILDEGARDE STANINGER, PH.D., RIET-1
   IN SUPPORT OF REQUEST FOR PROTECTIVE ORDERS

7.

Since the time I began working for Ms. DeVore, I have been under overt surveillance by one or more individuals sitting outside of my office in parked cars and vans for hours and days at a time and have experienced four separate events that I interpret as credible threats to end my life, because of my specialized knowledge related to Ms. DeVore. These events may have also been to frighten me and deter my efforts related to testifying for Ms. DeVore.

8.

On two separate occasions, I received an envelope which was engineered with Detrol® (chloroxylenol) (used as nanodispersive agent; fine dust dispersed in air) causing it to release an aerosol agent, which decomposes into chloroform naphthalene and other compounds when exposed to light after opening. In both instances, the smell upon release was instantaneous causing me to drop the envelope and flee. I quickly ran to my other office, which is next door, and immediately began decontamination protocols.

9.

Prior to this, an attempt was made to poison me by placing a toxic agent on my office door knob which caused an immediate surface skin reaction upon touch. I immediately ran to the sink and washed it off. I analyzed it and found the chemical dimethylsialyic siloxane.

10.

After two of these instances above, I was surveilled by autonomous micro drones resembling insects (flies). My cat caught the first one in her paws. I removed it from my cat, wrapped it and later photographed it. The photograph of the stomach area of the specimen had small yellow circles containing diodes that lit up when the specimen was photographed. I believe

AFFIDAVIT OF DR. HILDEGARDE STANINGER, PH.D., RIET-1
IN SUPPORT OF REQUEST FOR PROTECTIVE ORDERS

the purpose for surveilling me with the micro drones was to see my reaction to the poisons. (Photographs attached).

## 11.

Most recently, approximately three weeks ago, an attempt was made on my life via vehicular assault while I was crossing the street walking back to my office after having left a meeting with Ms. DeVore. I am talking to nearby businesses to see if it was captured on any video surveillance cameras.

## 12.

I also experienced numerous threats via telephone. I was able to keep 12 of these messages and will make them available at the Court's request.

## 13.

I believe the only reason I was not immediately injured by the poison attempts was due to my extensive training and experience that allowed me to react quickly and deploy mitigation measures.

## 14.

Substantial evidence exists demonstrating attempts to harm me or end my life. For these reasons set forth herein, I require immediate protective orders.

Respectfully submitted this 24th day of September 2018.

Dr. Hildegarde Staninger®, Ph.D., RIET-1

9/24/2018

AFFIDAVIT OF DR. HILDEGARDE STANINGER, PH.D., RIET-1
IN SUPPORT OF REQUEST FOR PROTECTIVE ORDERS

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _Los Angeles_

On _9/24/2018_ before me, _Seung H. Kim (notary public)_
(insert name and title of the officer)

personally appeared _Hildegarde Staninger_
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

SEUNG H. KIM
Notary Public – California
Los Angeles County
Commission # 2191919
My Comm. Expires Apr 15, 2021

# EXHIBIT 23

1
Dawn DeVore
2
15171 Victoria Lane
Huntington Beach, Ca 92647
3
707-635-3644
4
Dawndevore1@gmail.com

5
## UNITED STATES DISTRICT COURT
6
### EASTERN DISTRICT OF CALIFORNIA
500 I STREET, SACRAMENTO, CA 95814
7

8
PLAINTIFF'S NAME,                           Case No.: 2:18-CV-02487-KJM-AC
9
      DAWN DEVORE,
10
vs.
11
                                    **AFFIDAVIT OF**
**DR. RIMA E. LAIBOW, M.D., PH.D.**
12
DEFENDANT'S NAME,
**IN SUPPORT OF**
13
      DEPARTMENT OF JUSTICE, ET.AL.   **REQUEST FOR RESTRAINING ORDERS**

14
1.

15
    My name is Dr. Rima E. Laibow, M.D., Ph.D., License # 111813-A.  I am a
16
medical doctor and psychiatrist, in good standing.  A copy of my bio and curriculum vitae are
17
attached hereto for the Court's edification.

18
19
2.

20
    I am the founder and Medical Director of "Natural Solutions Foundation" an
21
international, non-governmental organization, active and registered in several countries, and a
22
not-for-profit 501 (c) (3) tax exempt organization in the United States, focused on discovering,
23
developing, documenting, demonstrating and disseminating natural solutions.

24
3.

25
    I am of the age of legal majority, and in all respects, I am capable and competent
26
27
to execute this Affidavit under provisions of California law.

28

AFFIDAVIT OF DR. RIMA E. LAIBOW, M.D., PH.D.
IN SUPPORT OF REQUEST FOR RESTRAINING ORDERS

4.

Ms. Dawn DeVore is a patient of mine since September 2017.   I am an expert witness in her case presently before this court:  CASE NO.: 2:18 CV-02487-KJM-AC

5.

Since the time I began caring for Ms. DeVore, I have experienced seven separate events which I believe are rightly interpreted as credible threats to end my life, because of my specialized knowledge related to Ms. DeVore, and for which I collected substantial evidence in support of my claims.

6.

Between the months of September 2017 through July 2018, I was assaulted on five separate occasions with autonomous micro drones resembling insects (four flies and one bee) carrying payloads of toxic chemicals including venoms and biological agents.  The bee was able to sting me, causing a severe localized reaction followed by severe illness lasting several days.

7.

The micro drones were collected and forwarded for advanced energy resonance analysis by an independent laboratory which showed they were genetically engineered biologic organisms (a hybrid form of a living insect) loaded with particles of biotoxic agents, including syphilis, traceable to the United States military and/or its contractors.

8.

Photomicrographs of the micro insect drones were taken that show these biologic insects had each been impregnated with a micro biosensor infused with the biotoxins.

AFFIDAVIT OF DR. RIMA E. LAIBOW, M.D., PH.D.
IN SUPPORT OF REQUEST FOR RESTRAINING ORDERS

9.

My research suggested these creatures are government produced; Department of Defense components and/or its military contractors. Out of an abundance of caution. in deference to National Security concerns, the photomicrographs and related reports are REDACTED at this time, but will be made available for the Court's review, at an appointed date/time decided upon by this Court.

10.

Because of these credible threats, I am requesting immediate protective orders. I am presently out of the country for my own protection.

Respectfully submitted this 21ˢᵗ day of September 2018.

X: *Electronically signed 9-21-18*

//Rima E. Laibow. MD//
New York State License 111813-A
Electronically signed

AFFIDAVIT OF DR. RIMA E. LAIBOW. M.D.. PH.D.
IN SUPPORT OF REQUEST FOR RESTRAINING ORDERS

# EXHIBIT 24

1   Dawn DeVore
2   15171 Victoria Lane
    Huntington Beach, Ca 92647
3   707-635-3644
4   Dawndevore1@gmail.com

5              UNITED STATES DISTRICT COURT
6                  EASTERN DISTRICT OF CALIFORNIA
                   500 I STREET, SACRAMENTO, CA 95814
7

8   PLAINTIFF'S NAME,              Case No.: 2:18-CV-02487-KJM-AC

9            DAWN DEVORE,

10  vs.                                   AFFIDAVIT OF
                                  DR. SUSAN KOLB, M.D., F.A.C.S.
11  DEFENDANT'S NAME,
                                       IN SUPPORT OF
12       DEPARTMENT OF JUSTICE, ET.AL.   REQUEST FOR RESTRAINING ORDERS
13                                1.

14

15  My name is Dr. Susan Kolb, M.D., F.A.CS., License number #031272.

16  I specialize in plastic and reconstructive surgery and have been certified by the American Board of

17  Plastic Surgery since 1985.   I have been in private practice in the Atlanta, Georgia area since 1988.

18

19  I graduated from Johns Hopkins University and received my medical degree from Washington

20  University School of Medicine. I   completed my post-graduate education in plastic surgery and

21  general surgery at Wilford Hall Medical Center.

22

23  I am the founder of Plastikos Surgery Center, established in 1995. The center is certified by the State

24  of Georgia and the Joint Commission of Healthcare Organizations, which is the highest level of

25  certification now available to outpatient centers.

26                                2.

27  Ms. DeVore was referred to me in June 2017 for examination and potential foreign body removal.

28  Ms. DeVore flew to my office for initial consultation in June 2017 at which time I scheduled her for

surgery on August 1, 2017.

**3.**

After scheduling Ms. DeVore for surgery, I received a communication from the Georgia
Senior Assistant Attorney General (SAAG), David Stubbins, indicating a complaint of some sort had
been made against me which, according to the Board, warranted a psychological evaluation. At no
time was I ever provided with any documentation of any such complaint. Attached to this Affidavit
is a true and correct copy of the email communications by and between myself, my attorney and
SAAG, David Stubbins.

In this communication, SAAG David Stubbins, asked me to sign a consent order stating that I would:
"agree not to engage in any kind of surgical or other medical procedure that involves locating
and removing electronic chips of any type that may have been inserted into any persons."

In response to this communication from SAAG, David Stubbins, I indicated as follows:

"I cannot sign the consent order for patients who are already scheduled as they have airline
tickets and it is a violation of my profession ethics to cancel them. There are no other doctors in
the US that I know of that can perform this surgery. If needed, I can get an affidavit from Dr.
Staninger to this effect. I can agree not to add any other patients, but I have no clue why I
would need a psych evaluation when we have evidence that I remove these chips. I only take
clients referred to me by Dr. Staninger who have evidence with frequency analysis of the
presence of these chips, and so far, every patient that I have operated on, has a chip removed.
Rather than a psych exam, I would think they could look at this evidence as there is no basis or
this psych exam if they looked at the evidence that we provided (the physical chip evidence and
the frequency analysis). I think you should ask for an amended report and look to see if they
stated a reason. What risk is the public at in their opinion? Two patients are scheduled for
Tues 1 August and Tues 22 August, at this point."

**4.**

Accordingly, I performed the foreign body removal surgery on Patient Dawn Devore on August 1, 2017 and forwarded the specimens for analysis which showed they were man made biomedical electronic devices or piece parts of the same.

**5.**

I underwent the psychological evaluation and was determined to not have any mental health issues. To date, I was never provided with the supposed complaint that was the basis for the psychological examination.

**6.**

As I understand it, Ms. DeVore has at least 11 more of these devices in her body that require surgical removal. Ms. DeVore was interested in scheduling surgeries to remove the rest of these foreign body devices; however, I received credible death threats after operating on Ms. DeVore, including threats that both of my hands would be "broken," and I would never be able to practice surgery again.

**7.**

My ability to assist Ms. DeVore in removing the remainder of these devices that are causing her significant illness and injury rests in my ability to protect myself from harm in doing so.

**8.**

For these reasons, I am requesting restraining orders barring the Defendants in Ms. DeVore's case, and any of their unknown affiliates, from further threats and obstruction efforts to allow me to proceed as Ms. DeVore's surgeon for the removal of the remainder of the foreign body devices in the body of Ms. DeVore. In my professional opinion, Ms. DeVore's survival is dependent upon removing these devices, including restraining orders barring defendants from implanting Ms. DeVore again.

Respectfully submitted,

_____ on this ____5____ day of November, 2018.

DR. SUSAN KOLB, M.D., F.A.C.S

AFFIDAVIT OF DR. SUSAN KOLB, M.D., F.A.C.S.
IN SUPPORT OF REQUEST FOR RESTRAINING ORDERS

SWORN TO AND SUBSCRIBED TO BEFORE ME

THIS ___7th___ DAY OF ___November___, 2018

_____ [NOTARY SEAL]  NOTARY PUBLIC

My Commission Expires:

___02/27/2020___

# EXHIBIT 25

—— Forwarded Message ——
**From:** AAA Security <service@aaasecurityco.com>
**To:** IHS <ihs-drhildy@sbcglobal.net>
**Sent:** Tuesday, July 16, 2019, 11:23:09 AM PDT
**Subject:** I had an interesting experience last week

Dr HS

Glad to hear Dawn was successful with her hearing. That is why we do what we do. Last week after I performed a scan on Gail Brown's RV and her companion I had a visit from an interesting character, I'm quite sure he was not associated with Gail Brown or her associate, but he may have followed her to me. He seemed to have information on a number of the people that I have done this kind of work for. I obviously was not at the top of my game that day for negotiations and I feel like I may have not taken first place in the debate we had. However after spending a day in the hospital, two days with my eyes swollen shut and spending most of yesterday working things out with my health insurance I may be rethinking some of my career choices. I have already committed to performing the scans that Dawn is coordinating but I'll need some time to heal, that is why I'm saying I won't be available to leave town until after Sept 24th Currently I feel like I'm doing a wonderful service by performing these scans and helping people get some kind of relief or restitution for their suffering, so I am not planning on throwing in the towel just yet on this kind of work. But in the future, I may be raising my fees to cover my own suffering. Anyway I have attached a pictured of what I look like today and as you can see I still have a lot of facial swelling and other personal damages that doesn't show up in the picture but I am dealing with it. However, I am at my office today and will be back to 100% ASAP. So you can keep sending people to me that need this kind of work.

It is greatly appreciated that you take care with whatever address or information that you give out about me.

Thank You

John



801-534-7508

**"Protecting What's Important"**



# EXHIBIT 26



# EXHIBIT 27

# Scientist in Harvard Arrested for Lying in Relations with China

By Daniel Kucher  -  January 29, 2020



**Charles Lieber, head of the Department of Chemistry and Chemical Biology, Harvard University, was arrested in the USA. The U.S. Department of Defense has announced that Lieber has been arrested for lying about China's ties to the program it runs to hire foreign scientists and researchers.**

Charles Lieber, who served as a department chair at Harvard University and led a lab in nanoscience, is accused of lying to the United States about his contact with China's plan known as the Thousand Talent Plan.

Speaking on Tuesday about the arrest of Charles Lieber, FBI special representative Robert Plumb announced that Lieber has set up a research laboratory at Wuhan University of Technology. Harvard University also issued a statement on the subject, explaining to Professor Lieber that the US government has made serious accusations, that the university is in full cooperation with the federal authorities, and that Lieber has been placed on administrative leave by the university administration indefinitely.

According to the statement made by the US Department of Defense following the arrest of Lieber, the cooperation between Professor Lieber and Chinese institutions covers between 2012 and 2017. According to the agreement between Lieber and Chinese institutions, Lieber was given a monthly salary of $ 50,000 alongside $ 150,000 a year for personal spending.

Charles Lieber, 60, was also the chief investigator in the US Department of Defense and the National Health Institute's millions of dollars worth of research.

U.S. Department of Defense officials announced that Lieber heard China's Thousand Talent Plan between 2018 and 2019, but said it was never part of the plan. However, Lieber's email correspondence shows that a 3-year agreement was signed between the professor and Wuhan University of Technology in 2012.

Charles Lieber, at Harvard University, worked in many areas, from finding new ways to produce new nanoscale materials, to developing "cyborg tissue" to integrate nano-electronic sensor research and nano-electronic sensors into tissue. Harvard University gave Lieber the title of University Professor, the highest university title in 2017.

US officials think that China's Thousand Talent Program is putting the scientific interests of the US at risk. The USA's claim is that China is stealing research with corporate spying and corporate spying through this program.

Charles Lieber's case, which was seen on Tuesday, was one of the three lawsuits filed against China as an economic espionage. 29-year-old Yanqinq Ye, along with Charles Lieber, is standing trial in the US on charges of smuggling biological materials and other research materials to China, since he lied that he was serving as a lieutenant in the Chinese army.

**Daniel Kucher**

*https://somagnews.com*

✉

# EXHIBIT 28

# Former Senator John Glenn on Informed Consent

## John Glenn on Informed Consent

THE CONGRESSIONAL RECORD

January 22, 1997

Statements on Introduced Bills and Joint Resolutions

(Page S645)

Human Research Subject Protection Act

*Mr. GLENN.* Madam President, I rise today to introduce the Human Research Subject Protection Act of 1997. I send the bill to the desk.

Mr. GLENN. Madam President, if I approached any Senator here and I said, 'You did not know it, but the last time they went to the doctor or went to the hospital, your wife or your husband or your daughter or your son became the subject of a medical experiment that they were not even told about. They were given medicine, they were given pills, they were given radiation, they were given something and were not even told about this, were not even informed about it, yet they are under some experimental research that might possibly do them harm — maybe some good will come out of it, but maybe it will do them harm also — but they do not know about it,' people would laugh at that and say that is ridiculous. That cannot possibly happen in this country. Yet, that very situation is what this piece of legislation is supposed to address.

I have been in public life and have served this country for many years. Frankly, I do not think too many things that I see surprise me anymore about our laws and about Government. Three years ago, though, I began to learn about a gap in our legal system that does truly concern me. In 1993 the Governmental Affairs Committee began to investigate the cold war radiation experiments. These experiments are one of the unfortunate legacies of the cold war, when our Government sponsored experiments involving radiation on our own citizens without their consent. They did not even know the experiments were being run on them. It was without their consent.

One of the most infamous of these experiments took place in my own State of Ohio, when scores of patients at the University of Cincinnati were subjected to large doses of radiation during experimental treatments, without their consent, without their informed consent. During the course of this investigation, I began to ask the

question, what protections are in place to prevent such abuses from happening again? What law prohibits experimenting on people without their informed consent? What I found, when I looked into it, is there is no law on the books requiring that informed consent be obtained. More important, I believe there is a need for such a law, as there continue to be cases where this basic right – I do view it as a basic right – is abused. As I started out, I would like to put this on a personal level for everyone of my colleagues. You just think about your own family, your own son, your own daughter, or grandchildren who might be, the next time they go to a doctor, the subject of some medical experiment that they are not even told about. I do not think there can be many things more un-American than that.

With the introduction of this bill today I hope to begin the process of correcting some serious gaps in our legal system. I want to make clear right now I am not seeking to bring medical research to a screeching halt. Please do not anybody at NIH, or anybody doing research throughout this country, think we are trying to stop that. We are not. That is not my intent and not the intent of this bill.

This country has the very finest health care system in the world, in part because of basic research. In fact, in large part because we have put more effort, more resources, more of our treasure into health research than any other nation in this world. In fact, I believe most people are not opposed to participating themselves in scientific research, if they are told about the pros and the cons. That is the goal of this legislation, to make sure that people have the appropriate information to make an informed choice about their medical treatment.

Everyone listening today probably has heard of the Nuremberg Code. That is the list of 10 ethical research principles which were produced as part of the judgment against Nazi physicians who engaged in truly heinous medical experiments during World War II.

The first principle of the Nuremberg Code states that the voluntary consent of the human subject of research is absolutely essential. Unfortunately, as we look back through our history since the late 1940's, it appears that researchers in America may not have taken all that Nuremberg lesson completely to heart.

I ask my colleagues what the following names might have in common: thalidomide, Tuskegee, and Willowbrook?

Well, the answer is that these are all sad examples of unethical research conducted in the United States, and in the United States well after the Nuremberg Code was issued, adopted and worldwide attention had been focused on some of the abuses of that time during World War II. Given this history, I find it astounding that even after Nuremberg, the thalidomide babies, Willowbrook, Tuskegee and the cold war radiation experiments, and who knows how many other cases, we still don't have a

law on our books requiring that informed consent – those two words, 'informed consent' – be obtained prior to conducting research on human subjects.

I have had research conducted on me because of my past activities before I came to the Senate in the space program and so on, but I knew what was being looked at, what was being tried. I knew the objectives of it, and I was willing to do that. I was happy to do it. But it was informed consent that I had personally, and I knew what I was getting into and glad to do it.

I think most people feel the same way. If they know what they are getting into and they feel there is a good purpose to it, they are willing to do it. But to do research on people when they don't even know what the research or the medicines or the radiation is that is being tried on them, I think is unconscionable.

What it comes down to is there are no criminal fines or penalties for violating the spirit or the letter of that Nuremberg Code that should be the basis of all of our informed consent in this country.

In fact, our own Constitution says, 'The right of the people to be secure in their persons . . . shall not be violated.'

So there is no explicit statutory prohibition against improper research. I must add that just because there is no law on the books does not mean there are no protections for people from unethical medical or scientific research.

These tragic incidents I have mentioned have resulted in changes in the way human research subjects are treated. I don't want to misrepresent this, because there is a very elaborate system of protections that have developed over the years. Unfortunately, though, this system does have some gaps and, if enacted, I believe this legislation will close those gaps. …[end excerpt]